[No. S164830. Jan. 21, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
PATRICK K. KELLY, Defendant and Appellant.

In re PATRICK K. KELLY on Habeas Corpus.

COUNSEL

Gloria C. Cohen and Gerald F. Uelmen, under appointments by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Donald E. De Nicola, Deputy State Solicitor General, Lawrence M. Daniels, Ana R. Duarte, Kristofer Jorstad and Michael R. Johnsen, Deputy Attorneys General, for Plaintiff and Respondent.

Robert E. Harris, in pro. per., for Proposition 215 as Amicus Curiae.

OPINION

**GEORGE, C. J.**—Health and Safety Code section 11362.77,[1] which is part of the Medical Marijuana Program (MMP) (§ 11362.7 et seq.), prescribes a specific amount of marijuana that a "qualified patient" may possess or cultivate. We granted review to determine whether this aspect of section 11362.77 is invalid under California Constitution, article II, section 10, subdivision (c), insofar as it amends, without approval of the electorate, the Compassionate Use Act of 1996 (CUA) (§ 11362.5), an initiative measure adopted by the voters as Proposition 215 in 1996. We conclude, consistently with the decision of the Court of Appeal below (and with the position of both parties in the present litigation), that insofar as section 11362.77 burdens a defense under the CUA to a criminal charge of possessing or cultivating marijuana, it impermissibly amends the CUA and in that respect is invalid under article II, section 10, subdivision (c). We also conclude, consistently with the views of both parties in the present litigation, that the Court of Appeal erred in concluding that section 11362.77 must be severed from the MMP and hence voided.

I.

In 1996, the California electorate approved Proposition 215 and adopted the CUA, which provides: "Section 11357, relating to the possession of marijuana, and Section 11358, relating to the cultivation of marijuana, shall not apply to a patient, or to a patient's primary caregiver, who possesses or cultivates marijuana for the personal medical purposes of the patient upon the written or oral recommendation or approval of a physician." (§ 11362.5,

---

[1] All further statutory references are to the Health and Safety Code unless otherwise indicated.

subd. (d).)[2] By this and related provisions, the CUA provides an affirmative defense to *prosecution* for the crimes of possession and cultivation. (See generally *People v. Mower* (2002) 28 Cal.4th 457, 474 [122 Cal.Rptr.2d 326, 49 P.3d 1067] (*Mower*); *People v. Wright* (2006) 40 Cal.4th 81, 98 [51 Cal.Rptr.3d 80, 146 P.3d 531] (*Wright*).) The CUA does not grant immunity from *arrest* for those crimes, however. So long as the authorities have probable cause to believe that possession or cultivation has occurred, law enforcement officers may arrest a person for either crime regardless of the arrestee's having a physician's recommendation or approval. (*Mower, supra*, 28 Cal.4th at pp. 467–469.)

Nor does the CUA specify an amount of marijuana that a patient may possess or cultivate; it states instead that the marijuana possessed or cultivated must be for the patient's "*personal medical purposes*." (§ 11362.5, subd. (d), italics added.) An early decision construed this provision of the CUA as establishing "that the *quantity possessed* by the patient or the primary caregiver, and the form and manner in which it is possessed, *should be reasonably related to the patient's current medical needs*." (*People v. Trippet* (1997) 56 Cal.App.4th 1532, 1549 [66 Cal.Rptr.2d 559], italics added (*Trippet*).)

Despite—or, perhaps, because of—this judicial construction of the CUA, questions persisted for both qualified medical marijuana patients and for law enforcement officers relating to enforcement of and arrest for possession,

---

[2] The CUA provides in full: "(a) This section shall be known and may be cited as the Compassionate Use Act of 1996. [¶] (b) (1) The people of the State of California hereby find and declare that the purposes of the Compassionate Use Act of 1996 are as follows: [¶] (A) To ensure that seriously ill Californians have the right to obtain and use marijuana for medical purposes where that medical use is deemed appropriate and has been recommended by a physician who has determined that the person's health would benefit from the use of marijuana in the treatment of cancer, anorexia, AIDS, chronic pain, spasticity, glaucoma, arthritis, migraine, or any other illness for which marijuana provides relief. [¶] (B) To ensure that patients and their primary caregivers who obtain and use marijuana for medical purposes upon the recommendation of a physician are not subject to criminal prosecution or sanction. [¶] (C) To encourage the federal and state governments to implement a plan to provide for the safe and affordable distribution of marijuana to all patients in medical need of marijuana. [¶] (2) Nothing in this section shall be construed to supersede legislation prohibiting persons from engaging in conduct that endangers others, nor to condone the diversion of marijuana for nonmedical purposes. [¶] (c) Notwithstanding any other provision of law, no physician in this state shall be punished, or denied any right or privilege, for having recommended marijuana to a patient for medical purposes. [¶] (d) Section 11357, relating to the possession of marijuana, and Section 11358, relating to the cultivation of marijuana, shall not apply to a patient, or to a patient's primary caregiver, who possesses or cultivates marijuana for the personal medical purposes of the patient upon the written or oral recommendation or approval of a physician. [¶] (e) For the purposes of this section, 'primary caregiver' means the individual designated by the person exempted under this section who has consistently assumed responsibility for the housing, health, or safety of that person." (§ 11362.5.)

cultivation, and other related marijuana offenses. In 2003, the Legislature found that "reports from across the state have revealed problems and uncertainties in the [CUA] that have impeded the ability of law enforcement officers to enforce its provisions as the voters intended and, therefore, have prevented qualified patients and designated primary caregivers from obtaining the protections afforded by the act." (Stats. 2003, ch. 875, § 1, subd. (a)(2).) In response, the Legislature enacted the MMP (§ 11362.7 et seq.) to "[c]*larify the scope of the application of the [CUA] and facilitate the prompt identification of qualified patients and their designated primary caregivers in order to avoid unnecessary arrest and prosecution of these individuals and provide needed guidance to law enforcement officers.*" (Stats. 2003, ch. 875, § 1, subd. (b)(1), italics added; see also *Wright, supra,* 40 Cal.4th 81, 93; *People v. Mentch* (2008) 45 Cal.4th 274, 290 [85 Cal.Rptr.3d 480, 195 P.3d 1061] [the MMP "immunizes from prosecution a range of conduct ancillary to the provision of medical marijuana to qualified patients"].)

Although the MMP did not literally amend the statute that established the CUA (that is, § 11362.5), the MMP did add 18 new code sections that address the general subject matter covered by the CUA. At the heart of the MMP is a voluntary "identification card" scheme that, unlike the CUA—which, as noted, provides only an *affirmative defense* to a charge of possession or cultivation—*provides protection against arrest* for those and related crimes. Under the MMP, a person who suffers from a "serious medical condition,"[3] and the designated "primary caregiver"[4] of that person, may register and receive an annually renewable identification card that, in turn, can be shown to a law enforcement officer who otherwise might arrest the program participant or his or her primary caregiver. Section 11362.71, subdivision (e) of the MMP provides in full: "No person or designated primary caregiver in possession of a valid identification card shall be subject to arrest for possession, transportation, delivery, or cultivation of medical marijuana *in an amount established pursuant to this article* [that is, the 18 new sections comprising the MMP], unless there is reasonable cause to believe that the information contained in the card is false or falsified, the card has been

---

[3] This term is defined by the MMP as including AIDS, anorexia, arthritis, cachexia, cancer, chronic pain, glaucoma, migraine, persistent muscle spasms (including, but not limited to, spasms associated with multiple sclerosis), seizures (including, but not limited to, seizures associated with epilepsy), severe nausea, and other "chronic or persistent medical symptom[s]" that "[s]ubstantially limit[] the ability of the person to conduct one or more major life activities as defined in the Americans with Disabilities Act of 1990" or that, "[i]f not alleviated, may cause serious harm to the patient's safety or physical or mental health." (§ 11362.7, subd. (h).)

[4] A "primary caregiver" is defined by the MMP in part as "the individual, designated by a qualified patient or by a person with an identification card, who has consistently assumed responsibility for the housing, health, or safety of that patient or person . . . ." (§ 11362.7, subd. (d).)

obtained by means of fraud, or the person is otherwise in violation of the provisions of this article." (Italics added.)[5]

The "amount established pursuant to this article" is addressed in section 11362.77, the statute at issue in this case. That section does two things: (1) it establishes *quantity limitations*, and (2) it sets forth a "safe harbor" by authorizing possession of specific amounts of medical marijuana within those specific limits.[6]

---

[5] Numerous other sections of the MMP concern identification cards. Section 11362.735, subdivision (a)(4), requires that each card contain a "24-hour, toll-free telephone number . . . that will enable state and local law enforcement officers to have immediate access to information necessary to verify the validity of the card." Various related provisions of the MMP govern matters such as card applications; means of verifying necessary background information contained in applications; the processing by county health departments of applications; annual renewal of and fees for cards; expiration of cards upon nonrenewal; the obligation of state or local law enforcement officers and agencies to accept an identification card absent reason to believe that the card is false or fraudulent, or is being used fraudulently; and penalties for fraudulent representations concerning, or fraudulent use of, an identification card. (See §§ 11362.71–11362.76, 11362.78, 11362.81.)

The remaining provisions of the MMP address significant ancillary matters. Section 11362.7 sets forth definitions. As explained in detail *post*, section 11362.77—the provision at issue in this case—establishes specific quantity limitations for possession and cultivation, and also establishes a "safe harbor" protecting against prosecution of those who legitimately possess amounts within those limits. Two sections afford immunity from criminal liability for various crimes—they parallel the immunity afforded by the CUA for possession and cultivation, and extend immunity for other related offenses, such as transportation of marijuana. (§§ 11362.765, 11362.775.) Section 11362.785 provides that no "accommodation" is required for the use of medical marijuana during employment or while incarcerated. Section 11362.79 clarifies that nothing in the MMP authorizes smoking of medical marijuana where smoking is barred by law or in other circumstances. Section 11362.795 addresses the use of medical marijuana while on probation, release on bail, or parole. Finally, section 11362.8 protects designated primary caregivers from civil penalties or disciplinary actions by licensing boards.

[6] Section 11362.77 provides in full: "(a) A qualified patient or primary caregiver may possess no more than eight ounces of dried marijuana per qualified patient. In addition, a qualified patient or primary caregiver may also maintain no more than six mature or 12 immature marijuana plants per qualified patient. [¶] (b) If a qualified patient or primary caregiver has a doctor's recommendation that this quantity does not meet the qualified patient's medical needs, the qualified patient or primary caregiver may possess an amount of marijuana consistent with the patient's needs. [¶] (c) Counties and cities may retain or enact medical marijuana guidelines allowing qualified patients or primary caregivers to exceed the state limits set forth in subdivision (a). [¶] (d) Only the dried mature processed flowers of female cannabis plant or the plant conversion shall be considered when determining allowable quantities of marijuana under this section. [¶] (e) The Attorney General may recommend modifications to the possession or cultivation limits set forth in this section. These recommendations, if any, shall be made to the Legislature no later than December 1, 2005, and may be made only after public comment and consultation with interested organizations, including, but not limited to, patients, health care professionals, researchers, law enforcement, and local governments. Any recommended modification shall be consistent with the intent of this article and shall be based on currently available scientific research. [¶] (f) A qualified patient or a person holding a valid

Subdivision (a) of section 11362.77 provides that a "qualified patient"[7] or primary caregiver may "*possess* no more than eight ounces of dried marijuana," and may, "[i]n addition, . . . *maintain* no more than six mature or 12 immature marijuana plants." (§ 11362.77, subd. (a), italics added.) The next two subdivisions of the same section provide qualified exceptions for even greater amounts. Subdivision (b) specifies that a patient may "possess an amount of marijuana consistent with the patient's needs," on condition that the patient "has a doctor's recommendation" stating that the quantity set out in subdivision (a) is insufficient for the patient's medical needs.[8] Subdivision (c) specifies that cities or counties may retain or enact guidelines allowing greater quantities than those set out in subdivision (a). These aspects of section 11362.77 evidently were designed to provide an objective, bright-line standard in lieu of the subjective, highly individualized reasonable-amount standard set forth in the CUA as construed by *Trippet, supra,* 56 Cal.App.4th at page 1549, thereby providing law enforcement officers with uniform standards, and providing patients who meet those standards (and their primary caregivers) with predictability. (See, e.g., Stats. 2003, ch. 875, § 1, subd. (b)(1).)

The MMP's safe harbor provision, subdivision (f) of section 11362.77, authorizes possession of certain amounts of medical marijuana. It provides that a "qualified patient or a person holding a valid identification card, or the designated primary caregiver of that qualified patient or person, may possess amounts of marijuana consistent with this article [that is, as provided in subdivisions (a)–(c) of section 11362.77]." By its terms, this safe harbor provision, which is not directly implicated on the facts of this case, would apply not only to those who hold MMP identification cards, but also to qualified patients or their primary caregivers—those persons who are entitled to the

identification card, or the designated primary caregiver of that qualified patient or person, may possess amounts of marijuana consistent with this article."

[7] A "qualified patient" is defined by the MMP as "a person who is entitled to the protections of Section 11362.5 [the CUA], but who does not have an identification card issued pursuant to this article." (§ 11362.7, subd. (f).)

[8] Under section 11362.77 of the MMP, a physician's "recommendation" (or, perhaps more accurately, statement) pursuant to subdivision (b)—that the eight-ounce quantity set forth in subdivision (a) does not meet a qualified patient's medical needs—is not required to be obtained *prior* to a defendant's arrest, but instead may be provided at trial. (See *Wright, supra,* 40 Cal.4th 81, 96–97 [crediting a physician's trial testimony that the amount of marijuana found in the defendant's possession at the time of his arrest—slightly more than one pound—was appropriate in light of the defendant's medical needs and his manner of use (primarily eating it rather than smoking it)]; *People v. Windus* (2008) 165 Cal.App.4th 634, 643 [81 Cal.Rptr.3d 227] [although the CUA requires that "a defendant must have obtained a recommendation to use medical marijuana prior to his or her arrest[,] . . . that recommendation need not specify an approved dosage or amount of marijuana that may be possessed. A doctor's opinion [under § 11362.77, subd. (b) of the MMP] that the amount in the defendant's possession meets his or her personal medical needs may be proffered at trial."].)

protections of the CUA but who do not obtain a program identification card that may provide protection against arrest.[9]

As alluded to above and further explained below, subdivision (a) of section 11362.77, by its terms, does not confine its specific quantity limitations to those persons who voluntarily register with the program and obtain identification cards that protect them against arrest. It also restricts individuals who are entitled, under the CUA, to possess or cultivate any quantity of marijuana reasonably necessary for their current medical needs, thereby burdening a defense that might otherwise be advanced by persons protected by the CUA. Moreover, although subdivision (b) of section 11362.77 allows *possession* of a quantity "consistent with the patient's needs" that is greater than the amount set out in subdivision (a), it affords this protection only if a physician so recommends—a qualification not found in the CUA.

## II.

Defendant Patrick K. Kelly has long suffered from, among other ailments, hepatitis C, back problems (including ruptured disks), a fused neck, nausea, fatigue, cirrhosis, loss of appetite, and depression. Over the course of 10 years, defendant attempted to treat the pain caused by these conditions with multiple epidurals, pain therapy, nerve stimulators, and various medications— some of which were very costly, exceeding his monthly income. Dissatisfied with this treatment plan, defendant decided to seek a recommendation to use marijuana as permitted by the CUA.

---

[9] In other words, pursuant to the MMP, persons designated by that statutory scheme as "qualified patients" or their "primary caregivers," but who do not register under the program and obtain valid identification cards, would enjoy two sources of protection. First, under the CUA, as construed in *Trippet, supra*, 56 Cal.App.4th at page 1549, such persons may possess and cultivate any amount of marijuana reasonably necessary for their current medical needs, and nothing in the MMP impairs those rights. (See MMP, § 11362.71, subd. (f) ["[i]t shall not be necessary for a person to obtain an identification card in order to claim the protections of Section 11362.5 [the CUA]"].) Second, section 11362.77, subdivision (f) of the MMP would allow these same persons to "*possess* amounts of marijuana consistent with this article" (italics added)—that is, *up to eight ounces* of dried marijuana (*id.*, subd. (a)), or even more than that amount if a physician so recommends (*id.*, subd. (b)), or if a city or county allows (*id.*, subd. (c)). By specifying an allowable quantity, the MMP would *enhance* the protections afforded to those who are covered by the CUA. And in other ways as well, the MMP would enhance protections afforded to those who are covered by the CUA. As observed *ante*, footnote 5, the MMP provides, in sections 11362.765 and 11362.775, immunity from criminal liability for other crimes, in addition to the offenses of marijuana possession and cultivation. In the present litigation, however, we address only the propriety of the MMP insofar as it *burdens* a defense otherwise afforded by the CUA. We do not consider, or intimate any view concerning, provisions of the MMP that would enhance protections afforded to those who are covered by the CUA.

In mid-February 2005, Dr. Eve Elting, a medical doctor employed by Medicann, a physician-owned entity that evaluates patients who wish to use marijuana for medical purposes, met with defendant. Dr. Elting reviewed defendant's medical records and a 15-page form that defendant had been asked to complete, spoke with him, and then gave him a written recommendation for marijuana use that expired in one year. Dr. Elting did not recommend a dosage,[10] and defendant apparently did not register under the MMP.

Because defendant was unable to afford marijuana from a dispensary, he began to grow it at home for his personal use. Defendant consumes approximately one to two ounces of marijuana each week by smoking it, using it in a vaporizer, and consuming it in brownies. He testified that the marijuana lessens his nausea, but that its effectiveness has decreased over time.

---

[10] The California Medical Association (CMA) counsels physicians that because "the federal government has taken the position that physicians may not lawfully prescribe cannabis for medical use . . . ," physicians should avoid offering advice concerning, among other things, "how much medicinal cannabis the patient should take to obtain therapeutic relief." (Cal. Medical Assn. Legal Counsel, CMA On-Call Document No. 1315, The Compassionate Use Act of 1996: The Medical Marijuana Initiative (Jan. 2009) p. 15 (hereafter CMA On-Call).) The CMA also advises: "A physician should be free to opine that the allowable amount of cannabis does not appear to meet a particular patient's medical needs, if the physician has a reasonable basis for such an opinion. However, CMA does not advise physicians to specify the amount of cannabis that would be consistent with the patient's needs." (*Id.*, at p. 16, italics & boldface omitted; see also *id.*, at p. 20 ["A physician should avoid . . . [o]ffering a specific patient individualized advice concerning appropriate dosage timing, amount, and route of administration." (italics & boldface omitted)].)

The CMA's recommendation is itself based upon federal case law holding that, because medical marijuana users and cannabis clubs operating under the CUA remain subject to federal drug prosecution, the federal Controlled Substances Act (21 U.S.C. § 801 et seq.) gives the federal government authority to withhold the ability to prescribe drugs from physicians who act contrary to the "public interest," including by the unlawful dispensing of controlled substances such as "medical marijuana." (See 21 U.S.C. §§ 823(f), 824(a); *Gonzales v. Raich* (2005) 545 U.S. 1, 32–33 [162 L.Ed.2d 1, 125 S.Ct. 2195]; *United States v. Oakland Cannabis Buyers' Cooperative* (2001) 532 U.S. 483, 494 & fn. 7 [149 L.Ed.2d 722, 121 S.Ct. 1711]; see also *Conant v. Walters* (9th Cir. 2002) 309 F.3d 629, 634–639 [although physicians have a 1st Amend.-based right to discuss the pros and cons of medical marijuana use with patients, if physicians advise patients concerning how to obtain the drug, physicians risk triggering liability under federal law for aiding and abetting the unlawful possession of a controlled substance].)

We note that the United States Department of Justice recently clarified its enforcement priorities with regard to states, such as California, that have enacted laws authorizing the medical use of marijuana. (U.S. Dept. of Justice, Memorandum for Selected United States Attorneys (Oct. 19, 2009) <http://www.justice.gov/opa/documents/medical-marijuana.pdf> [as of Jan. 21, 2010].) Although this policy change may give physicians somewhat increased confidence in their ability lawfully to recommend the use of marijuana for medical treatment, it is clear that there has been no *substantive* change in federal law.

In October 2005, a confidential informant told a law enforcement officer that he or she suspected defendant of growing marijuana. Los Angeles County Deputy Sheriff Michael Bartman went to the informant's home in the City of Lakewood, from which the deputy could observe marijuana plants growing in defendant's backyard. Law enforcement officers obtained a warrant, and thereafter Deputy Bartman, along with seven to nine other officers, arrested defendant and searched his home. They found seven potted marijuana plants and additional marijuana plants growing in the soil outside the garage in the backyard of defendant's home. They also discovered seven plastic bags, most of which were vacuum sealed, each containing one to two ounces of dried marijuana, along with a small amount of marijuana in a jar. In total, deputies seized slightly more than 12 usable ounces of dried marijuana. Deputies also recovered a scale and a loaded firearm from a nightstand in the master bedroom. No other traditional indicia of sales—such as pagers, cell phones, "pay-owe sheets," cash money in bills, "nickel and dime bags" (bags used to hold small amounts of marijuana, to be sold for $5 or $10), safes, or sophisticated growing systems—were found during the search. Nor was there any record of complaints by neighbors specifically concerning excessive foot traffic at defendant's home.

Dr. Elting's original written recommendation for medical use of marijuana was found in the master bedroom, and a copy was found taped to a wall of the garage. A deputy called the phone number on the recommendation and was told that defendant had a "prescription" to use marijuana. Defendant was arrested and charged with possessing marijuana for sale (§ 11359) and cultivating marijuana (§ 11358).[11]

Prior to trial, defendant moved to bar the prosecution from eliciting testimony concerning the quantity limitations set out in section 11362.77, on the ground that the statute, in that regard, constitutes an impermissible amendment of the CUA. After an extensive hearing the trial court denied the motion. The court explained that it would instruct the jury pursuant to CALCRIM No. 2370, which, as the court observed, "doesn't mention [specific] amounts," and provides instead that the amount possessed or cultivated

---

[11] As observed earlier, defendant apparently had not registered under the MMP, and lacked a program identification card that might have protected him from arrest. In any event, even had defendant possessed such a valid card, it would not have prevented his arrest on these facts, because more than eight ounces of dried marijuana was found in his possession. (§ 11362.71, subd. (e) [protection against arrest applies with regard to marijuana "in an amount established pursuant to this article"]; § 11362.77, subd. (f) [authorizing possession of "amounts of marijuana consistent with this article"—including subd. (a), which establishes an eight-ounce possession limit].) Nor does the record suggest that either of the two exceptions set out in section 11362.77 applied to authorize greater quantities. (See § 11362.77, subd. (b) [physician's statement that the amount set out in subd. (a) is insufficient]; *id.*, subd. (c) [city or county's authorization to exceed the limits set out in subd. (a)].)

must be reasonably related to the patient's current medical needs. Neverthe-less, the trial court ruled that the prosecutor would be permitted to question witnesses concerning section 11362.77 and also argue to the jury, consistently with this statute, that defendant possessed more than eight ounces of dried marijuana and yet lacked a physician's recommendation for possessing more than that amount. In that regard, the trial court ruled: "I think the Legislature has a right to—I don't really [think] it changed the [CUA]. I think it further defined it. So, that's my ruling."[12]

At the subsequent jury trial, Deputy Bartman testified that, in his opinion, the marijuana recovered from defendant's home was possessed for sale. Bartman explained that he reached this conclusion despite the circumstance that most of the dried marijuana found at defendant's home was vacuum packed in relatively large quantities of approximately one to two ounces, instead of the one-ounce and much smaller nickel and dime bags typically used in sales. The deputy surmised that defendant had packaged the mari-juana in larger quantities in order to supply other sellers, who in turn would repackage smaller amounts of the product into smaller containers. On earlier cross-examination, however, it was revealed that Deputy Bartman had mini-mal experience concerning marijuana used for medicinal purposes.

Defendant testified concerning his medical ailments and treatment efforts. He also explained that he used the scale that was found in his bedroom to ensure that he never took more than one ounce of marijuana with him when he traveled, because, although he knew he was permitted to possess medical marijuana, he did not "know what the law is on carrying it," and he also understood that as a general matter "over an ounce is a felony."

Christopher Conrad testified as a medical marijuana expert for the defense. Conrad explained that storing marijuana in vacuum-packed baggies is consis-tent with medicinal use, and that the total amount found (slightly more than 12 ounces of "dried mature processed flowers") also was consistent with personal use. Conrad observed that, assuming defendant consumed the mari-juana found in his home at a rate of two ounces a week, the supply would last

---

[12] Because of its concerns about the potential vagueness of the "mature" versus "immature" classification terminology established by section 11362.77, subdivision (a), the trial court tentatively ruled that the provision was unconstitutional, and that the prosecution would not be permitted to focus upon that distinction or inform the jury how much defendant's seven plants weighed. Instead, the trial court ruled, the prosecution would be allowed simply to note the circumstance that seven plants were found on his premises. Thereafter, during trial, in response to testimony by defendant's expert witness, the court on its own motion reversed its prior ruling that the statutory distinction between mature and immature plants was unconstitutional. In addition, the court denied the prosecution's further request to include, in the instruction modeled on CALCRIM No. 2370, the specific quantity limitations set out in section 11362.77. The court stated that the prosecution was "free to argue that to the jury, but I'm not going to put it in the instruction."

him slightly more than six weeks.[13] Dr. Elting testified concerning her recommendation that defendant use marijuana to treat his ailments.

On cross-examination of both Conrad and Dr. Elting, the prosecutor, consistently with the trial court's rulings, emphasized that section 11362.77 provides that a person may possess no more than eight ounces of dried marijuana unless the person has a medical recommendation to exceed that amount, and he elicited the agreement of these witnesses with his reading of the statute. This in turn prompted the trial court to instruct the jury spontaneously, near the conclusion of the cross-examination of Conrad: "[J]ust so the jury knows, because they're the ones that have to decide this case. This statute, basically, says you can have eight ounces of dried marijuana. But it also says later on that if . . . a city or a county says you could have more, then they could pass some law that says you can have more. That's basically what it says." Immediately thereafter, the prosecutor elicited testimony from Conrad establishing that, as far as the witness knew, the County of Los Angeles had not passed any law to "expand the eight ounce limitation."

Subsequently, the jury was given an instruction modeled on CALCRIM No. 2370, which, consistently with the CUA, explained that defendant was permitted to possess or cultivate an amount of marijuana reasonably related to his current medical needs.[14] Notably, the jury was *not* instructed that, in the absence of a physician's recommendation that eight dried ounces was insufficient, defendant had a right to possess *only* that amount.

Thereafter, however—and again, consistently with the trial court's denial of defendant's motion to exclude evidence of statutory quantity limitations, and with the court's spontaneous comment to the jury during the cross-examination of Conrad—the prosecutor in argument to the jury repeatedly stressed that defendant lacked a physician's recommendation to possess more than eight ounces of dried marijuana. The opening three paragraphs of the prosecutor's summation were as follows: "This is, ladies and gentlemen, the final leg of the trial. The law is pretty simple in this case. Whether or not you

---

[13] Conrad testified that smoking marijuana produces a faster medicinal effect, but that the effect does not last as long as when marijuana is eaten. On the other hand, Conrad testified, approximately four times the amount of marijuana must be eaten in order to achieve the equivalent effect of smoking it.

[14] The jury was instructed as follows: "Possession or cultivation of marijuana is not unlawful if authorized by the Compassionate Use Act. The Compassionate Use Act allows a person to possess or cultivate marijuana for personal medical purposes when a physician has recommended or approved such use. *The amount of marijuana possessed or cultivated must be reasonably related to the patient's current medical needs.* The People have the burden of proving beyond a reasonable doubt that the defendant was not authorized to possess or cultivate marijuana for medical purposes. If the People have not met this burden, you must find the defendant not guilty of this charge." (Italics added.)

agree with the law, disagree with the law, it's irrelevant. You have to follow the law. [¶] The facts are that the defendant has [a] physician's statement that he can use marijuana for medical purposes. That's not in dispute, ladies and gentlemen. . . . But, what's also clear is that *the law says he can only have eight ounces* of dried [marijuana]. And testimony by the defense expert Mr. Conrad stated that the amount that was recovered . . . was about . . . 12 ounces. [¶] Well, guess what? Twelve ounces is . . . more than eight ounces of marijuana. . . . So what happens if the defendant has more than eight ounces of the dried marijuana stuff? *Then, there has to be some evidence to show that the doctor recommended more than that. And there is no evidence,* ladies and gentlemen. It's not disputed that there is no evidence presented to show that the defendant has any medical recommendation that exceeds the eight ounces." (Italics added.)

After further arguing that, in his view, the evidence demonstrated that defendant was both using marijuana and selling it, the prosecutor continued: "If, for example, you decide, well you know what? I don't think he intend[ed] to possess for sale. But, you know what? What he can possess is only eight ounces. Remember, ladies and gentlemen. So, the excess that he possess[ed], the other four ounces you can consider that in the possession charge. . . ."

Thereafter, defense counsel's closing argument urged the jury to determine that defendant neither sold marijuana nor intended to do so, and that the amount possessed and cultivated by defendant was reasonable for his personal medical use and hence was protected by the CUA. In response, the prosecutor, in his final summation to the jury, argued that defense counsel was "asking you to be legislators" and "interpreters of the law," but "[t]hat's not your job here, ladies and gentlemen. Your job is to follow the law. And the law says, whether we agree with it or not, the law says very clearly in black and white, Health and Safety Code section 11362.77[, subdivision] (a), I'm going to read it to you right now. 'A qualified patient'[—]we're not disputing that he's a qualified patient[—]'or primary caregiver may possess no more than eight ounces of dried marijuana per qualified patient. In addition, a qualified patient or primary caregiver may also maintain no more than six mature or 12 immature plants per qualified patient.' " The prosecutor also read to the jury section 11362.77, subdivision (b): " 'If a qualified patient or primary caregiver has a doctor's recommendation that [t]his quantity does not meet the qualified patient's medical needs, the qualified patient or primary caregiver may possess an amount of marijuana consistent with the patient's needs.' "

The prosecutor asserted: *"What does that mean? He can have eight ounces of the dried stuff. We know he has 12 at least, he can have eight ounces of the stuff or [sic: and] he can have six immature [sic: mature] plants. Evidence*

*was that they found seven plants in this particular case. But you know what? We're not saying, no, you can't have what you need. That's not what the law says. The law says before you can have more than that you need a doctor's recommendation. He doesn't have a doctor's recommendation, ladies and gentleman.*" (Italics added.) The prosecutor continued in this vein, and then concluded: "Bottom line. . . . The law, it is what it is and we all have to follow it. [¶] You're not to guess at why the Legislature [wrote] the law the way it is. It is what it is. In this case *you can't have more than eight ounces, unless he has [a] recommendation and he doesn't have that.*" (Italics added.)

The jury deliberated for approximately 90 minutes and found defendant guilty of "possessing more than 28.5 grams [one ounce] of marijuana (§ 11357, subd. (c))"—a lesser offense of the charged count of possessing marijuana for sale (§ 11359). The jury also found defendant guilty as charged of cultivating marijuana (§ 11358). The trial court placed defendant on three years' probation under various terms and conditions, including that he serve two days in jail, less credit for two days already served.

## III.

The Court of Appeal held, first, that section 11362.77 of the MMP, insofar as it limits the amount of medical marijuana that a person protected by the CUA may possess, constitutes an amendment of the CUA in violation of California Constitution, article II, section 10, subdivision (c), which precludes legislative amendment of an initiative measure unless the measure explicitly permits such an amendment.[15] Second, the Court of Appeal held that section 11362.77 is "unconstitutional" in its entirety—and "must be severed from the MMP."

Third and finally, addressing an issue concerning which we did not grant review, the Court of Appeal determined that although the trial court properly instructed the jury under the CUA that defendant could possess an amount of marijuana reasonably related to his current medical needs, the court improperly permitted the prosecutor to elicit testimony indicating that the quantity limitations set out in section 11362.77 applied to defendant and to his defense under the CUA—and to extensively so argue to the jury. In other words, the Court of Appeal concluded that the jury was informed, in essence, that the quantity limitations set out in section 11362.77 overrode the CUA's guarantee (confirmed in *Trippet, supra,* 56 Cal.App.4th at p. 1549) that a qualified patient is permitted to possess and cultivate any amount reasonably necessary

---

[15] This constitutional provision reads in full: "The Legislature may amend or repeal referendum statutes. It may amend or repeal an initiative statute by another statute that becomes effective only when approved by the electors unless the initiative statute permits amendment or repeal without their approval." (Cal. Const., art. II, § 10, subd. (c).)

for his or her medical needs. This, the Court of Appeal held, constituted prejudicial error: "We cannot conclude that the jury found defendant guilty because [it] believed the amount of marijuana he possessed and cultivated was not reasonably related to his medical needs, as opposed to believing defendant was guilty because he had more marijuana than section 11362.77 says he may have. Defendant therefore is entitled to a reversal of the judgment."[16]

As explained in part IV below, we agree with the Court of Appeal's first determination—that section 11362.77 is unconstitutional insofar as it burdens a defense, provided by the CUA, to charges of possessing or cultivating marijuana. But, as explained in part V below, we disagree with the Court of Appeal's second conclusion—that section 11362.77 is wholly invalid, and that it "must be severed from the MMP."

IV.

We first address the Court of Appeal's conclusion that section 11362.77 of the MMP, insofar as that statute establishes quantity limitations, constitutes an amendment of the CUA, in violation of California Constitution, article II, section 10, subdivision (c). That provision (quoted in full, *ante*, fn. 15) states in relevant part: "The Legislature . . . may amend or repeal an initiative statute by another statute that becomes effective only when approved by the electors unless the initiative statute permits amendment or repeal without their approval."

▇ Significantly, as alluded to earlier, section 11362.77 of the MMP does not confine the reach of its quantity limitations to those persons who voluntarily elect to register with the program and obtain identification cards, but instead extends its reach to "qualified patient[s]" and their "primary caregiver[s]." The term qualified patient is defined by the MMP as "*a person who is entitled to the protections of Section 11362.5 [the CUA]*, but who *does not have an identification card* issued pursuant to this article [that is, the MMP]." (§ 11362.7, subd. (f), italics added.) The term primary caregiver is defined by the MMP as an "individual, designated by a qualified patient or by

---

[16] Defendant also filed a petition for a writ of habeas corpus, asserting that his trial counsel performed deficiently by failing to move to suppress evidence seized during the search of petitioner's home pursuant to a search warrant. The petition asserted, in essence, that the officers had a duty to investigate the possible existence of a physician's recommendation for the use of marijuana, before a search warrant could be issued. The Court of Appeal consolidated the writ proceeding with the appeal, and denied the writ, explaining that, contrary to petitioner's view, our opinion in *Mower, supra*, 28 Cal.4th 457, 463–464, does not support the proposition advanced by petitioner. This issue was not included in our order granting review in this matter, and we do not consider it.

a person with an identification card, who has consistently assumed responsibility for the housing, health, or safety of that patient or person." (§ 11362.7, subd. (d).) In other words, section 11362.77, on its face, sets quantity limitations *not only* for those persons who voluntarily register under the MMP and hold a valid identification card that provides protection against arrest. The statute also applies to and sets limits for all those "qualified patient[s]" and "primary caregiver[s]" who are entitled under the CUA to possess or cultivate any amount reasonably necessary for the patient's current medical needs. We proceed to consider whether, in this respect, section 11362.77 constitutes an amendment of the CUA, in violation of California Constitution, article II, section 10, subdivision (c).[17]

### A.

■ We begin with the observation that "[t]he purpose of California's constitutional limitation on the Legislature's power to amend initiative statutes is to 'protect the people's initiative powers by precluding the Legislature from undoing what the people have done, without the electorate's consent.' [Citations.]" (*Proposition 103 Enforcement Project v. Quackenbush* (1998) 64 Cal.App.4th 1473, 1484 [76 Cal.Rptr.2d 342] (*Proposition 103 Enforcement Project*).) In this vein, decisions frequently have asserted that courts have a duty to " ' "jealously guard" ' " the people's initiative power, and hence to " ' "apply a liberal construction to this power wherever it is challenged in order that the right" ' " to resort to the initiative process " ' "be not improperly annulled" ' " by a legislative body. (*DeVita v. County of Napa* (1995) 9 Cal.4th 763, 776 [38 Cal.Rptr.2d 699, 889 P.2d 1019] [construing analogous right to enact initiative county ordinances under Cal. Const., art. II, § 11, as governed by Elec. Code, § 9125]; see also *Associated Home Builders etc., Inc. v. City of Livermore* (1976) 18 Cal.3d 582, 591 [135 Cal.Rptr. 41, 557 P.2d 473], and cases cited [construing analogous right to enact initiative city ordinances under what is presently Cal. Const., art. II, § 11].)

At the same time, despite the strict bar on the Legislature's authority to amend initiative statutes, judicial decisions have observed that this body is not thereby precluded from enacting laws addressing the general subject matter of an initiative. The Legislature remains free to address a " 'related but distinct area' " (*County of San Diego v. San Diego NORML* (2008) 165 Cal.App.4th 798, 830 [81 Cal.Rptr.3d 461] (*San Diego NORML*); see also *Mobilepark West Homeowners Assn. v. Escondido Mobilepark West* (1995) 35 Cal.App.4th 32, 43 [41 Cal.Rptr.2d 393] (*Mobilepark West Homeowners Assn.*) [construing the related initiative power of city voters under Cal. Const., art. II, § 11, and Elec. Code, § 9217]) or a matter that an initiative measure

---

[17] All further undesignated constitutional references are to the California Constitution.

"does not specifically authorize *or* prohibit." (*People v. Cooper* (2002) 27 Cal.4th 38, 47 [115 Cal.Rptr.2d 219, 37 P.3d 403] (*Cooper*); see *San Diego NORML, supra,* 165 Cal.App.4th at p. 830.)

### B.

■ With these considerations in mind, we turn to the case law addressing what constitutes an "amendment" for purposes of article II, section 10, subdivision (c). Although some decisions contain broad definitions of the amendment process in this context,[18] for purposes of resolving the issue in the present case we need not endorse any such expansive definition.[19] It is sufficient to observe that for purposes of article II, section 10, subdivision (c),

---

[18] For example, *Franchise Tax Bd. v. Cory* (1978) 80 Cal.App.3d 772, 776–777 [145 Cal.Rptr. 819] (*Cory*) states: "An amendment is '. . . any change of the scope or effect of an existing statute, whether by addition, omission, or substitution of provisions, which does not wholly terminate its existence, whether by an act purporting to amend, repeal, revise, or supplement, or by an act independent and original in form . . . [.]' (Sutherland, Statutory Construction (4th ed. 1972) § 22.01, p. 105.) A statute which adds to or takes away from an existing statute is considered an amendment. (*Robbins v. O. R. R. Company* (1867) 32 Cal. 472.) [¶] In *Assets Reconstruction Corp. v. Munson* (1947) 81 Cal.App.2d 363, 368 [184 P.2d 11], the court described an amendment as ' "a legislative act designed to change some prior or existing law by adding or taking from it some particular provision." ' And in *Balian Ice Cream Co. v. Arden Farms Co.* (S.D.Cal. 1950) 94 F.Supp. 796, 798–799, the analysis necessary to determine whether a particular act is or is not an amendment to a prior statute is described as follows: 'Whether an act is amendatory of existing law is determined not by title alone, or by declarations in the new act that it purports to amend existing law. On the contrary, it is determined by an examination and comparison of its provisions with existing law. If its aim is to clarify or correct uncertainties which arose from the enforcement of the existing law, or to reach situations which were not covered by the original statute, the act is amendatory, even though in its wording it does not purport to amend the language of the prior act.' " (Italics omitted.) Although various aspects of this language quoted from *Cory* have been repeated with apparent approval by subsequent decisions (see, e.g., *Huening v. Eu* (1991) 231 Cal.App.3d 766, 774–775 [282 Cal.Rptr. 664] (*Huening*)), we observe that none of the cases or authorities cited in the quoted passage considered or construed the term "amendment" in the context of a constitutional provision that restricts legislative amendment of an initiative statute.

[19] We do, however, question some of the broad language in prior decisions such as *Cory, supra,* 80 Cal.App.3d 772, 776–777 (quoted *ante,* fn. 18), which in some respects conflicts with the language that we quoted above at the conclusion of part IV.A. For example, *Cory* relies upon an extensive quotation from *Balian Ice Cream Co. v. Arden Farms Co., supra,* 94 F.Supp. 796, 798–799, to suggest that a statute is "amendatory" under article II, section 10, subdivision (c), if the statute's " 'aim is to . . . correct uncertainties which arose from the enforcement of the existing law, or to reach situations which were not covered by the original statute.' " (*Cory, supra,* 80 Cal.App.3d at p. 777.) As applied to the question of what constitutes an amendment under the constitutional provision, these statements from *Balian Ice Cream Co.*—a decision that did not concern or even address this question—appear overbroad and inconsistent with the observations in *Cooper* and *San Diego NORML* that, despite the constitutional provision, the Legislature remains free to enact laws addressing the general subject matter of an initiative, or a "related but distinct area" of law that an initiative measure "does not specifically authorize *or* prohibit." (*Cooper, supra,* 27 Cal.4th 38, 47; see *San Diego NORML, supra,* 165 Cal.App.4th 798, 830.)

an amendment includes a legislative act that changes an existing initiative statute by taking away from it. (*Cooper, supra,* 27 Cal.4th 38, 44; *Knight v. Superior Court* (2005) 128 Cal.App.4th 14, 22 [26 Cal.Rptr.3d 687] (*Knight*); *Proposition 103 Enforcement Project, supra,* 64 Cal.App.4th 1473, 1484–1486; *Mobilepark West Homeowners Assn., supra,* 35 Cal.App.4th 32, 40 [construing the related initiative power of city voters under Cal. Const., art. II, § 11, and Elec. Code, § 9217]; *Cory, supra,* 80 Cal.App.3d 772, 776.)

Applying this definition and related formulations (see *ante,* fn. 18), courts have determined that certain statutes constitute impermissible amendments of initiative measures. (See *Proposition 103 Enforcement Project, supra,* 64 Cal.App.4th 1473, 1486–1487 [legislative statute that shifted and reduced insurers' rate-rollback obligations impermissibly amended Prop. 103, an initiative statute]; *Huening, supra,* 231 Cal.App.3d 766, 779 [legislative statute that governed ballot arguments impermissibly amended Political Reform Act of 1974 (Gov. Code, § 81000 et seq.), an initiative measure]; *Cory, supra,* 80 Cal.App.3d 772, 776–777 ["control language" inserted by Legislature in budget bill, in order to restrict manner of audits required by Political Reform Act, impermissibly amended that act].)

On other facts, courts have found no amendment, and hence no violation of article II, section 10, subdivision (c). (See *Cooper, supra,* 27 Cal.4th 38, 44 [legislative limitation on presentence conduct credits did not amend 1978 Briggs Initiative]; *Knight, supra,* 128 Cal.App.4th 14, 25 [Legislature's enactment of domestic partnership statutes did not conflict with or take away from Prop. 22, an initiative statute providing that "Only marriage between a man and a woman is valid or recognized in California," and hence did not constitute amendment of that statute]; *San Diego NORML, supra,* 165 Cal.App.4th 798, 831 [Legislature's imposition of "identification card" requirements on counties under the MMP did not improperly amend the CUA, an initiative measure].)

## C.

The Court of Appeal's analysis began with a review of the voters' intent in enacting the CUA. The court observed: "The CUA does not quantify the marijuana a patient may possess. Rather, the only 'limit' on how much marijuana a person falling under the CUA may possess is" that it must be " 'reasonably related to the patient's current medical needs.' " (Quoting *Trippet, supra,* 56 Cal.App.4th 1532, 1549.) The appellate court continued: "Ballot materials make clear that this is the only 'limitation' on how much

marijuana a person under the CUA may possess.[20] . . . According to these ballot statements, the CUA does not place a numeric cap on how much marijuana is sufficient for a patient's personal medical use. [¶] Section 11362.77, however, does just that. It specifies that a qualified patient may possess eight ounces of dried marijuana [and may maintain] six mature or 12 immature marijuana plants. (§ 11362.77, subd. (a).) A qualified patient may possess a greater quantity if the patient has a doctor's recommendation that the quantity in subdivision (a) does not meet the qualified patient's medical needs. (§ 11362.77, subd. (b).)[21] In other words, section 11362.77 . . . has clarified what is a reasonable amount for a patient's personal medical use, namely, eight ounces of dried marijuana [or a greater quantity if a physician so recommends, plus cultivation of six mature or 12 immature marijuana plants]. [¶] But clarifying the limits of 'reasonableness' is amendatory."

The Court of Appeal further observed: "The Legislature's imposition of quantity limits in section 11362.77 . . . imposes a numeric cap [and the requirement of a physician's recommendation in order to possess more than eight ounces] where the CUA imposed none. Indeed, the Legislature itself recognized it had overstepped its bounds in imposing the cap. In 2004, Senator John Vasconcellos, who introduced the MMP, authored and introduced Senate Bill No. 1494. . . . [That bill] would have amended section 11362.77 by, among other things, deleting the eight-ounce and plant limits [and substituting a new subd. (a)] as follows: 'A qualified patient, a person with an identification card, or any designated primary caregiver may possess *any amount* of marijuana consistent with the medical needs of that qualified patient or person with an identification card.' (Italics added.)[22] [¶] In introducing Senate Bill No. 1494 . . . Senator Vasconcellos acknowledged the

---

[20] At this point the Court of Appeal observed: "An argument against the CUA was [that] it 'allows unlimited quantities of marijuana to be grown anywhere . . . in backyards or near schoolyards without any regulation or restrictions. This is not responsible medicine. It is marijuana legalization.' (Ballot Pamp., Gen. Elec. (Nov. 5, 1996), argument against Prop. 215, p. 61.) San Francisco District Attorney Terence Hallinan responded, 'Proposition 215 does not allow "unlimited quantities of marijuana to be grown anywhere." It only allows marijuana to be grown for a patient's personal use. Police officers can ·still arrest anyone who grows too much, or tries to sell it.' (*Id.*, rebuttal to argument against Prop. 215, p. 61.)"

[21] As the Court of Appeal was careful to specify, subdivision (b) of section 11362.77 speaks only of the right to "possess" dried marijuana in a quantity consistent with a patient's needs—it does not expressly track subdivision (a) by covering both possession of dried marijuana *and* maintenance (cultivation) of plants. Moreover, insofar as the right to possess marijuana is concerned, subdivision (b) contemplates a standard similar to the "reasonable amount" standard afforded under the CUA as construed by *Trippet, supra*, 56 Cal.App.4th 1532, 1549. That subdivision, however, imposes a substantial qualification on that right, not imposed by the CUA, by requiring a physician's recommendation that an eight-ounce allotment does not meet the person's medical needs.

[22] At this point, the Court of Appeal in a footnote observed that Senate Bill No. 1494 (2003–2004 Reg. Sess.) would have amended section 11362.77's remaining subdivisions to read as follows: "(b) (1) A person with an identification card or a primary caregiver with an

MMP's constitutional flaw when he said, ' "[Senate Bill No. 1494] is a clean-up bill . . . intended to correct a drafting error in my medical marijuana bill signed into law last year. . . . [The MMP's] language may be problematic because it states that all qualified patients (with or without identification cards) are subject to guidelines provided in [the] statute. Despite intent language in our bill stating that the program is intended to be voluntary, many advocates argued that it amends the initiative by making the guidelines mandatory—therefore making it unconstitutional. In order to avoid any legal challenges, it is important to make a distinction between 'qualified patient' (which applies to all patients) and 'persons with identification cards.' " ' (Assem. Com. on Pub. Safety[, Analysis of] Sen. Bill No. 1494 (2003–2004 Reg. Sess.) as amended Mar. 22, 2004, p. 3; see also Sen. Health & Human Services Com., Analysis of Sen. Bill No. 1494 (2003–2004 Reg. Sess.) as amended Mar. 22, 2004, p. 3 [the change effected by the MMP 'could be viewed as an unlawful amendment to Proposition 215, an initiative that did not provide a mechanism for amendments'].)"

Finally, the Court of Appeal below concluded: "Deleting the quantity limits in the manner suggested by Senate Bill No. 1494 . . . would have corrected the constitutional problem created when the Legislature enacted the MMP without voter approval. Governor Schwarzenegger, however, vetoed the bill, citing a concern that the bill removed '[r]easonable and established quantity guidelines.' (Governor Arnold Schwarzenegger's [veto message concerning] Sen. Bill No. 1494, July 19, 2004.) That may be a valid concern. Nevertheless, it is a concern that cannot be addressed by the Legislature acting without the voters' approval. We therefore . . . hold that section 11362.77 unconstitutionally amends the CUA . . . ."

---

identification card shall not be subject to arrest for possessing eight ounces or less of dried marijuana per person with an identification card, and maintaining six or fewer mature or 12 or fewer immature marijuana plants per person with an identification card. [¶] (2) Nothing in this section is intended to affect any city or county guidelines to the extent that the amounts contained in those guidelines exceed the quantities set forth in paragraph (1). [¶] (c) If a physician determines that the quantities specified in subdivision (b) do not meet the medical needs of the person with an identification card, that person or that person's primary caregiver with an identification card may possess an amount of marijuana consistent with those medical needs and shall not be subject to arrest for possessing that amount. [¶] (d) Only the dried mature processed flowers of female cannabis plant or the plant conversion shall be considered when determining allowable quantities of marijuana under this section. [¶] (e) The Attorney General may recommend modifications to the possession or cultivation limits set forth in this section. These recommendations, if any, shall be made to the Legislature no later than December 1, 2005, and may be made only after public comment and consultation with interested organizations, including, but not limited to, patients, health care professionals, researchers, law enforcement, and local governments. Any recommended modification shall be consistent with the intent of this article and shall be based on currently available scientific research."

## D.

In this court, both parties essentially agree with the foregoing conclusion reached by the Court of Appeal. The Attorney General, who petitioned for this court's review of the appellate decision, states at the outset of his opening brief: "Respondent does not contest the Court of Appeal's conclusion that section 11362.77 is unconstitutionally amendatory insofar as it limits an in-court CUA defense." The Attorney General subsequently concludes that "application of section 11362.77's limits to the in-court CUA defense exceeds the boundaries of legislative power under article II, section 10, subdivision (c) . . . by replacing the CUA's 'reasonableness' standard with specified, numeric guidelines." Defendant, unsurprisingly, agrees with the Attorney General in these respects.

The interpretation and application of article II, section 10, subdivision (c) adopted by the Court of Appeal and the parties—namely, that it prohibits an amendment that arguably merely clarifies an initiative statute by substituting seemingly reasonable, objective standards and restrictions, in place of a difficult-to-apply "reasonable amount" test—may at first blush seem to be overly strict. Indeed, as discussed below, a determination that a statute such as section 11362.77 is unconstitutional in this regard almost certainly would *not* be the conclusion reached by a court faced with similar legislation under the law of any other state. And yet, as explained below, the conclusion reached by the Court of Appeal and the parties is amply supported by, and indeed compelled by, not only the prior California cases that have discussed the initiative power and applied the foregoing constitutional provision, but also by the history of our state's initiative process.

### 1

As noted earlier, article II, section 10, subdivision (c) of the California Constitution states in relevant part: "The Legislature . . . may amend or repeal an initiative statute by another statute that becomes effective only when approved by the electors unless the initiative statute permits amendment or repeal without their approval." California's bar on legislative amendment of initiative statutes stands in stark contrast to the analogous constitutional provisions of other states. (Center for Governmental Studies, Democracy by Initiative: Shaping California's Fourth Branch of Government (2d ed. 2008) p. 114 (hereafter Democracy by Initiative, 2d ed.) ["No other state in the nation carries the concept of initiatives as 'written in stone' to such lengths as to forbid their legislatures from updating or amending initiative legislation"]; see generally Miller, *Constraining Populism: The Real Challenge of Initiative Reform* (2001) 41 Santa Clara L.Rev. 1037, 1046–1047 (hereafter Miller); Manheim & Howard, *A Structural Theory of the Initiative Power in California* (1998) 31 Loyola L.A. L.Rev. 1165, 1197–1198.)

Currently, 21 state constitutions allow the electorate to adopt statutes by initiative measure.[23] (Dubois & Feeney, Lawmaking by Initiative: Issues, Options and Comparisons (1998) pp. 27–28 (hereafter Dubois and Feeney, Lawmaking by Initiative).) Of those jurisdictions, 12 place no limitation whatsoever[24] upon the authority of the legislature to repeal or amend an initiative statute. In those states, an initiative statute is treated just like any other statute, and may be repealed or amended at any time. (See Comment, *Power of the Legislature to Amend or Repeal Direct Legislation* (1942) 42 Wash. U. L.Q. 439, 440–442 [decisions unanimously have held that, absent language in a charter explicitly restricting a legislature's right to amend or repeal, a state legislature retains that authority even as to initiative statutes].)

Eight of the remaining nine states that allow voters to adopt statutes by initiative measure place various limitations upon the authority of the legislature to act in response to an initiative statute. Two of these jurisdictions allow *amendment* by the legislature at any time, but impose a moratorium on legislative *repeal* until two years after adoption of the initiative statute.[25] Three states place a two- to seven-year moratorium on repeal or amendment, and yet some of these same jurisdictions allow amendment by a two-thirds vote during the moratorium period, and by a simple majority thereafter.[26] Three other states allow amendment at any time by a supermajority vote of

---

[23] In addition to California's Constitution (Cal. Const., art. II, §§ 8 & 10), those state constitutions include: Alaska Constitution, article XI; Arizona Constitution, article 4, part 1, section 1(1) and (2); Arkansas Constitution, article 5, section 1; Colorado Constitution, article V, section 1(1); Idaho Constitution, article III, section 1; Maine Constitution, article IV, part 3d, section 18; Massachusetts Constitution, amendment article XLVIII; Michigan Constitution, article II, section 9; Missouri Constitution, article III, section 49; Montana Constitution, article III, section 4; Nebraska Constitution, article III, section 2; Nevada Constitution, article 19, section 2; North Dakota Constitution, article III, section 1; Ohio Constitution, article II, sections 2.01, 2.01a, and 2.01b; Oklahoma Constitution, article 5, sections 1 and 2; Oregon Constitution, article IV, section 1(2); South Dakota Constitution, article III, section 1; Utah Constitution, article VI, section 1; Washington Constitution, article II, section 1; Wyoming Constitution, article 3, section 52.

[24] These states are: Colorado, Idaho, Maine, Massachusetts, Missouri, Montana Nebraska, Ohio, Oklahoma, Oregon, South Dakota, and Utah.

[25] See Alaska Constitution, article XI, section 6; Wyoming Constitution, article 3, section 52(f).

[26] See Nevada Constitution, article 19, section 2, paragraph 3 (moratorium on repeal and amendment for three years); North Dakota Constitution, article III, section 8 (moratorium on repeal and amendment for seven years, but the legislature may amend by two-thirds vote during that period); Washington Constitution, article II, section 1(c) (moratorium on repeal and amendment for two years, but the legislature may amend by two-thirds vote during that period).

the legislature, and one of those states—Arizona—additionally requires that the amending legislation "further[s] the purposes" of the original initiative measure.[27]

In order to illuminate the scope and effect of California's constitutional provision prohibiting the Legislature from amending an initiative adopted by the people, we describe below the history of the provision and of the various attempts and proposals to change it.

2

At the close of the 19th century, a small but vocal contingent of reformers, pointing to the record of "direct democracy" in Switzerland, campaigned for the adoption of the initiative and referendum process in the United States.[28] A concerted effort to include similar provisions in the California Constitution began early in the 20th century and consumed a decade.[29] During that time 10 states—led by South Dakota, Utah, and Oregon—acted prior to California and granted the powers of initiative and referendum to the electorate.[30]

Although the provisions of some of those state constitutions withheld authority from the governor to veto initiative statutes passed by the electorate,[31] all but one imposed no restraint whatsoever upon the state legislature's

[27] Arizona Constitution, article 4, part 1, section 1(6)(C) (three-quarters vote required); see Arkansas Constitution, article 5, section 1 (two-thirds vote required); Michigan Constitution, article II, section 9 (three-quarters vote required).

[28] See, e.g., Sullivan, Direct Legislation by the Citizenship Through the Initiative and Referendum (1893) pages 5–14; see generally Goebel, A Government by the People: Direct Democracy in America, 1890–1940 (2002) pages 31–33, and authorities cited (hereafter Goebel); Schmidt, Citizen Lawmakers: The Ballot Initiative Revolution (1989) pages 5–6; Dubois & Feeney, Lawmaking by Initiative, *supra*, at pages 46–70.

[29] See Key and Crouch, The Initiative and Referendum in California (1939) pages 425–426 (recounting the efforts of Dr. John Randolph Haynes) (hereafter Key and Crouch); Goebel, *supra*, at pages 85–90 (same).

[30] See South Dakota Constitution, article III, section 1 (as amended Nov. 8, 1898); Utah Constitution, article VI, section 1, paragraph 2 (as amended Nov. 6, 1900); Oregon Constitution, article IV, section 1 (as amended June 2, 1902); Montana Constitution, article V, section 1 (as adopted Dec. 7, 1906); Oklahoma Constitution, article V, section 2 (eff. Nov. 16, 1907); Maine Constitution, article IV, part 1st, section 1 (as amended by art. XXXI in 1908); Michigan Constitution, article V, section 1 (as amended, eff. Jan. 1, 1909); Missouri Constitution, article IV, section 57 (as amended Nov. 3, 1908); Colorado Constitution, article V, section 1 (as amended Nov. 8, 1910); Arkansas Constitution, article V, section 1 (as adopted Jan. 12, 1911). (Numeral styles for provisions of the early state constitutions cited herein are, for the most part, as set forth in The state constitutions and the federal Constitution (Kettleborough edit., 1918) (hereafter Kettleborough).

[31] See, for example, the provisions of the Colorado, Michigan, Missouri, Montana, Oregon, and South Dakota Constitutions cited *ante*, footnote 30.

power to either repeal or amend an initiative statute.[32] Oklahoma's provision, enacted in 1907, most explicitly preserved legislative power to repeal or amend initiative laws: "The reservation of the powers of the initiative and referendum in this article shall not deprive the legislature of the right to *repeal any law,* [*or*] *propose or pass any measure*, which may be consistent with the constitution of the State and the Constitution of the United States." (Okla. Const. of 1907, art. V, § 7, italics added, as reprinted in Kettleborough, *supra*, at p. 1098.) The sole exception to this approach in a state charter was reflected in Michigan's provision, effective in early 1909, which specified the most limited authority for the state legislature to act with respect to a matter that had been adopted by the voters as an initiative. The Michigan provision, no longer in effect, read: "*No act . . . adopted by the people at the polls under the initiative provisions of this section shall be amended or repealed, except by a vote of the electors* unless otherwise provided in said initiative measure, *but the legislature may propose such amendments, alterations or repeals to the people.*" (Mich. Const. of 1909, art. V, § 1, italics added, as reprinted in Kettleborough, *supra*, at p. 689.)[33]

During the time in which other states were incorporating initiative provisions into their respective constitutions, the California Legislature permitted charter cities to do the same as a local matter. San Francisco, in 1898, and Los Angeles, in 1903, each adopted charters permitting local initiatives, and in doing so included provisions similar to that subsequently adopted by Michigan in 1909, under which the legislative body, although barred from amending an initiative measure on its own, at least was authorized to *propose* that the electorate adopt a specific amendment to an initiative ordinance. (S.F. Charter, art. II, § 20, as adopted by the S.F. electorate May 26, 1898; L.A. City Charter, art. XIX, § 198a, subd. (b), as amended Jan. 1, 1903.)[34] The

[32] Indeed, most state charters specifically provided that the initiative power "shall not be construed so as to deprive the legislature or any member thereof of the right to propose any measure" (S.D. Const., art. III, § 1, as amended 1898) or words to that effect. (See the provisions of the Arkansas, Colorado, Missouri, Montana, and Oregon constitutions cited *ante*, fn. 30.)

[33] Effective in 1964, Michigan amended its provision to allow legislative repeal or amendment of an initiative statute, at any time, by a three-quarters vote. (Mich. Const., art. II, § 9, adopted by the electorate Apr. 1, 1963, eff. Jan. 1, 1964.)

[34] The San Francisco provision, which apparently was the first in the state to establish the local initiative, was approved by the Legislature in 1899. (Assem. Conc. Res. No. 6, Stats. 1899, res. ch. 2, p. 241 et seq.) It specified that an ordinance adopted by initiative "shall not be repealed by the supervisors. But the supervisors may submit a proposition for the repeal of such ordinance, or for amendments thereto, for a vote [by the electorate] at any succeeding election." (*Id.*, at p. 247, reprinting art. II, § 20 of the S.F. Charter.) The Los Angeles provision, approved by the Legislature in 1903 (Sen. Conc. Res. No. 4, Stats. 1903, res. ch. 4, p. 555 et seq.), read: "[A]ny ordinance proposed by petition, or which shall be adopted by a vote of the people can not be repealed or amended, except by a vote of the people. [¶] . . . [¶] The council may submit a proposition for the repeal of any such ordinance, or for amendments thereto, to

City of Sacramento, by contrast, took a different and stricter approach when it revised its own charter in 1903 to permit the enactment of ordinances by initiative. Its charter provided, simply and starkly: "[A]ny ordinance proposed by petition . . . which shall be adopted by a vote of the people, *cannot be repealed or amended, except by a vote of the people.*" (Sac. City Charter, art. XII, § 231, as amended Nov. 3, 1903, italics added.)[35]

At each session of the California Legislature convened between 1903 and 1909, proposals were advanced to put before the electorate constitutional amendments designed to extend the initiative and referendum statewide. Although most of these bills departed from the prevailing approach of the other states (and followed the strict approach of the Sac. charter) by expressly barring any amendment by the Legislature of initiative statutes,[36] legislation proposed in 1907 temporarily changed course and sought to adopt

be voted upon at any succeeding general city election . . . ." (*Id.*, at p. 573, reprinting § 198a, subd. (b) of the L.A. City Charter; see generally Sitton, John Randolph Haynes: California Progressive (1992) pp. 36–44 [describing history of the L.A. provision and early lobbying for a statewide initiative provision].)

[35] The Sacramento provision, apparently the third in the state to establish the local initiative, was approved by the Legislature in early February 1905. (Sen. Conc. Res. No. 5, Stats. 1905, res. ch. 12, p. 924 et seq.) In the years between 1905 and 1910, 16 additional California "home rule cities" adopted initiative procedures. (See Key & Crouch, *supra*, at p. 428, fn. 14 [listing the cities].)

Presently, Elections Code section 9125, governing county initiatives, and section 9217, governing city initiatives, perpetuate the "Sacramento version" of the strict rule, permitting no amendment of a local initiative measure "unless provision is otherwise made in the original ordinance." Current local charters also follow that approach. (See Sac. City Charter, § 160 [making the provisions of the Elec. Code applicable to local initiatives]; S.F. Charter, § 14.101 ["No initiative . . . approved by the voters shall be subject to veto, or to amendment or repeal except by the voters, unless such initiative . . . shall otherwise provide."]; but see L.A. City Charter, § 464, subd. (a) ["Any ordinance adopted by a vote of the electors of the City pursuant to an initiative petition cannot be amended or repealed, except by an ordinance proposed either by petition or by the Council at its own instance and adopted by a vote of the electors, or by an amendment of the Charter superseding the ordinance."].)

[36] In 1903: Assembly Constitutional Amendment No. 15 (introduced Jan. 20, 1903, by Mr. Camp, p. 3 ["No measure adopted or approved by vote of the electorate shall be subject to veto, or be amended or repealed except by vote of the electorate"]); Senate Constitutional Amendment No. 9 (introduced Jan. 19, 1903, by Sen. Hubbell, p. 3 [same]). In 1905: Assembly Constitutional Amendment No. 6 (introduced Jan. 16, 1905, by Mr. Prescott, p. 2 [same]); Senate Constitutional Amendment No. 5 (introduced Jan. 10, 1905, by Sen. Pendleton, p. 2 [same]). In 1907: Senate Constitutional Amendment No. 6 (introduced Jan. 14, 1907, by Sen. Anthony, p. 2 [same]).

In 1909: Senate Constitutional Amendment No. 6 (introduced Jan. 8, 1909, by Sen. Black, p. 3 [proposing that "[a] statute adopted by direct vote of the people can be repealed or amended only by direct vote of the people"]); Senate Constitutional Amendment No. 9 (introduced Jan. 8, 1909, by Sen. Anthony, p. 2 [proposing that "[n]o measure adopted or approved by vote of the electorate shall be subject to veto, or be amended or repealed [except] by vote of the electorate"]); Assembly Constitutional Amendment No. 11 (introduced Jan. 11, 1909, by Mr. Drew, p. 3 [same as Sen. Const. Amend. No. 6, introduced by Sen. Black]); see generally

the majority view in the United States, *allowing* legislative amendment of statutes adopted by initiative.[37] No matter how framed, however, each effort to create a statewide initiative power met the same fate: it failed to secure the necessary support of two-thirds of each house of the Legislature, and hence no such proposal was submitted to the electorate.

Thereafter, in drafting the ultimately successful California measure of 1911, the proponents did not follow the majority model, under which the state legislature was left free to repeal or amend initiative statutes just like any other statute. Nor did the drafters of the California provision follow even the minority model of San Francisco, Los Angeles, and Michigan, under which the legislative body could not directly repeal or amend, but at least could propose to the voters that an initiative measure be repealed or amended.[38] Instead, California's legislative drafters proposed, and the California voters ultimately adopted, a measure that—more strictly than any other state (then or now), but like the then extant Sacramento charter—withheld all independent authority from the Legislature to take any action on measures enacted by initiative, unless the initiative measure itself specifically authorized such action. In Senate Constitutional Amendment No. 22, the voters endorsed, as Proposition 7 on the 1911 ballot, the predecessor to our present article II, section 10, subdivision (c), as follows: "Any act, law or amendment to the constitution submitted to the people by either initiative or referendum petition and approved by a majority of the votes cast thereon, at any election, shall take effect five days after the date of the official declaration of the vote by the secretary of state. No act, law or amendment to the constitution, initiated or adopted by the people, shall be subject to the veto power of the governor, and

---

Hichborn, Story of the Session of the California Legislature of 1909 (1909) pages 192–201 (colorfully describing the drafting and defeat of the 1909 proposals).

[37] See Assembly Constitutional Amendment No. 17, introduced January 31, 1907, by Mr. Davis, pages 1–2 (containing no provision limiting veto by Governor, or limiting legislative amendment of initiative measures); Senate Constitutional Amendment No. 25, introduced January 21, 1907, by Senator Caminetti, page 2 (same; also providing—as in a number of other state constitutions (*ante*, fn. 32): "This section shall not be construed to deprive any member of the legislature of the right to introduce any measure").

[38] The drafters of the statewide initiative also departed from the approach that had been employed by the Legislature with respect to the use of the initiative and referendum at the county level. On April 3, 1911, the Legislature had approved former Political Code section 4058, providing for initiative and referendum ordinances by counties, and in doing so it had embraced the San Francisco, Los Angeles, and Michigan model, providing that "[t]he board of supervisors may submit to the people, without a petition therefor, a proposition for the repeal of any adopted ordinance or for amendments thereto . . . to be voted upon at any succeeding general or special election and if such proposition so submitted receive a majority of the votes cast thereon at such election, such ordinance shall be repealed or amended accordingly." (Stats. 1911, ch. 342, § 1, p. 579; see also Stats. 1912, 1911 Ex. Sess. ch. 31, § 1, p. 127.) As observed *ante*, footnote 35, the Legislature subsequently reverted to the strict "Sacramento version" of the rule, permitting no amendment of a local (city or county) initiative unless that initiative itself so allows.

*no act, law or amendment to the constitution, adopted by the people at the polls under the initiative provisions of this section, shall be amended or repealed except by a vote of the electors, unless otherwise provided in said initiative measure*; but acts and laws adopted by the people under the referendum provisions of this section may be amended by the legislature at any subsequent session thereof." (Cal. Const., former art. IV, § 1, added by Prop. 7, Special Elec. (Oct. 10, 1911), italics added.)

At the next legislative session, two proposed constitutional amendments were introduced, each of which endeavored to change the new initiative provision by, among other things, giving the Legislature authority to amend initiative statutes upon a supermajority vote of each house.[39] Neither effort secured the necessary legislative support of two-thirds of each house, and hence neither proposal was submitted to the voters.

Similar unsuccessful efforts to amend the initiative process were undertaken in subsequent years. In 1919, Assembly Constitutional Amendment No. 16 was introduced in the Legislature, proposing a constitutional amendment that, if approved by the voters, would have eliminated the initiative power and permitted the Legislature to repeal or amend previously enacted initiative statutes.[40] Related, but less drastic, legislative proposals for constitutional amendments were made in the early- to mid-1920's. One proposal sought to allow legislative repeal or amendment after a moratorium of four years following adoption of an initiative statute.[41] Another proposal, consistent with the National Municipal League's 1924 model state constitution,[42] proposed to specify that initiative laws be "subject to amendment by the

---

[39] See Senate Constitutional Amendment No. 56, introduced February 3, 1913, by Senator Gates, pages 2–3, 7 (proposing to increase the number of signatures required for initiative statutes and constitutional amendments, and proposing to adopt a new subd. (j) to former art. IV, § 1, providing that any initiative law "may be repealed or amended by the legislature by three fourths of the members elected to each house"); Assembly Constitutional Amendment No. 59, introduced February 3, 1913, by Mr. Clark (same).

[40] Assembly Constitutional Amendment No. 16, introduced January 21, 1919, by Mr. Wickham, would have eliminated any specific authorization for the people to employ the initiative power, while retaining the power of referendum. The proposed provision also stated: "Nothing herein shall be construed so as to prevent the legislature from repealing or amending, any act, or measure heretofore enacted into law by what is known as the initiative." (*Id.*, at p. 2.)

[41] See Assembly Constitutional Amendment No. 11, introduced January 19, 1923, by Mr. Dozier (proposing to adopt a new § "1*b*" of former art. IV).

[42] Section 40 of the model constitution provided: "The initiative and referendum provisions of this constitution shall be self-executing . . . . Laws may be enacted to facilitate their operation, but no law shall be enacted to hamper, restrict or impair the exercise of the powers herein reserved to the people." (Nat. Municipal League, A Model State Constitution (rev. ed. 1924) § 40, p. 9.)

legislature" so long as the amendment did not "destroy the intent and purpose of the act or . . . cripple or prevent the carrying out of the provisions thereof."[43]

In the meantime, statutes enacted by the electorate as initiatives posed problems that demanded attention and amendment. And yet, such statutes were so difficult to amend that they were aptly characterized by contemporaneous commentators as being, "in effect," "quasi-constitutional amendments." (Key & Crouch, *supra*, at p. 481.) For example, although it became clear that an amendment would benefit the Chiropractic Initiative Act, adopted in 1922, the Legislature apparently believed that it lacked clear authority even to *submit* to the voters any *proposed* measure to amend that initiative statute.[44] Accordingly, no proposal to change the 1922 chiropractic act emanated from the Legislature. Instead, signatures laboriously were gathered to place onto the ballot proposed amendments in the form of followup voter initiative measures. Such ballot measures concerning the 1922 chiropractic act were submitted to the voters, and rejected by them, in 1934 and 1939.[45]

This and a similar experience with the equally problematic "Torrens Land Title Act" or "Land Title Law," adopted by the voters as an initiative statute in 1914,[46] eventually triggered the first of only three substantive changes that have been made to the Constitution's initiative provision since its adoption in 1911. (See, *post*, fn. 55.) There apparently was no entity willing and able to mount an initiative campaign to amend the Torrens Act initiative statute, and

---

[43] See Assembly Constitutional Amendment No. 22, introduced January 23, 1925, by Mr. Cleveland, page 3 (proposing to amend former art. IV, § 1 to read: "[A]ll initiative laws which are now enforced or may hereafter be adopted by the people are subject to amendment by the legislature; *provided*, that the legislature shall not have the power to destroy the intent and purpose of the act or to cripple or prevent the carrying out of the provisions thereof").

[44] See Ballot Pamphlet, General Election (Nov. 5, 1946) argument in favor of Proposition 12, part I, page 12 ("It is uncertain under the wording of [former art. IV, § 1] whether a proposal to amend an initiative measure may be submitted by the Legislature to the people for their consideration.").

[45] Proposition 9, in 1934, proposed to amend the 1922 chiropractic initiative statute to, among other things, create a state chiropractors association; define chiropractic and physical therapy, and regulate these practices; regulate chiropractic schools; and provide for chiropractic licenses and fees. (Ballot Pamp., Gen. Elec. (Nov. 6, 1934) text of Prop. 9, pt. II, pp. 13–24.) The ballot argument in favor of the measure explained that only "[t]he people . . . can vote a change in [the 1922 initiative statute]." (*Id.*, pt. I, p. 14.) Likewise, Proposition 2, in 1939, proposed somewhat similar amendments. The argument in favor of Proposition 2 observed: "[T]he changes asked for in this amendment . . . can only be done by the people voting 'YES' on this amendment." (Ballot Pamp., Special Elec. (Nov. 7, 1939) pt. I, p. 6.)

[46] That measure as enacted (hereafter Torrens Act initiative statute) was described as "An act to amend an act entitled 'An act for the certification of land titles and the simplification of the transfer of real estate.' " (Ballot Pamp., Gen. Elec. (Nov. 3, 1914) text of Land Title Law, p. 59.) In many respects the Torrens Act initiative statute proved unworkable. (See, e.g., 12 Witkin, Summary of Cal. Law (10th ed. 2005) Real Property, § 369, p. 434.)

as observed earlier, the Legislature evidently believed that the strict language of the constitutional provision (former art. IV, § 1) might be construed to forbid the Legislature even from *proposing* such an amendment to the voters. In response, in 1945 the Legislature adopted, and then proposed to the voters, Senate Constitutional Amendment No. 22 (Stats. 1945, ch. 147, pp. 3163–3164). That provision was designed to amend article IV, section 1, by adding section 1b, to permit "the Legislature to *amend or repeal any act adopted by vote of the people under the initiative, to become effective only when submitted to and approved by the electors.*" (Stats. 1945, ch. 147, p. 3164, italics added.)[47] The ballot argument in favor of Senate Constitutional Amendment No. 22, submitted to the voters as Proposition 12, explained that "adoption . . . will do away with our present cumbersome methods and will provide an orderly and responsible way in which amendments to initiative laws may be proposed, *and at the same time preserve to the people their primary right to approve or reject all such measures.*" (Ballot Pamp., Gen. Elec., *supra*, argument in favor of Prop. 12, pt. I, p. 12, italics added.) The voters adopted Proposition 12 at the 1946 General Election.

In 1948, 1950, and 1952 the Legislature employed its new authority to pass and then propose for voter approval a series of amendments to the 1922 chiropractic initiative statute.[48] Thereafter, to address the problems related to the 1914 Torrens Act initiative statute, the Legislature in 1954 used its new authority to propose an amendment to that law, giving the Legislature broad power to amend or repeal that particular act. (Stats. 1955, 1st Ex. Sess. 1954, ch. 58, § 1, pp. 331–332.) The voters ratified the Legislature's proposal at the 1954 General Election,[49] thereby removing the need for any future approval by the electorate for amendments to the Torrens Act, and subsequently the Legislature repealed that law. (Stats. 1955, ch. 332, § 1, pp. 789–790.) No such broad authorization had been sought by or given to the Legislature with respect to the 1922 chiropractic initiative statute, however, and as a result, on

---

[47] The provision read in full: "Sec. 1b. Laws may be enacted by the Legislature to amend or repeal any act adopted by vote of the people under the initiative, to become effective only when submitted to and approved by the electors unless the initiative act affected permits the amendment or the repeal without such approval. The Legislature shall by law prescribe the method and manner of submitting such a proposal to the electors." (Stats. 1945, ch. 147, p. 3164.) In other words, this provision was designed to give to the California Legislature the same authority earlier granted to local legislative bodies under the charters of San Francisco and Los Angeles—and granted to the Michigan Legislature by the then extant Michigan Constitution, former article V, section 1—authority which, by virtue of its omission from California Constitution, former article IV, section 1, the Legislature assumed it did not possess.

[48] The voters enacted both Proposition 16 (Gen. Elec., Nov. 2, 1948) and Proposition 7 (Gen. Elec., Nov. 7, 1950), but rejected Proposition 17 (Gen. Elec., Nov. 4, 1952).

[49] See Ballot Pamphlet, General Election (Nov. 2, 1954) text of Proposition 7, part II, page 7 (amending the 1914 Land Title Law (Torrens Act) to add § 116, providing: "The Legislature may amend or repeal all or any part of this act at any time" [boldface omitted]).

seven occasions since 1960, the Legislature has been forced to ask the electorate to approve additional amendments to this 1922 initiative statute.[50]

Although the 1946 amendment to former article IV, section 1, gave the Legislature a method by which it might propose a specific amendment to, or repeal of, an initiative-enacted law, that change also carefully preserved article IV's original strict safeguards by requiring the *electorate's approval* of any legislative proposal to amend or repeal (unless the initiative measure itself allowed amendment or repeal without voter approval). Even this slight modification in the relationship between statutes adopted by initiative and those adopted by the Legislature, however, still left voter-adopted initiative statutes in California far more insulated from adjustment than in any other jurisdiction.[51]

In the mid-1960's, California, assisted by the California Constitution Revision Commission, undertook a revision of the Constitution. (See generally *Californians for an Open Primary v. McPherson* (2006) 38 Cal.4th 735, 752–754 [43 Cal.Rptr.3d 315, 134 P.3d 299].) Although some commentators questioned the then existing provision of article IV that strictly limited the legislative amendment of statutes adopted by initiative,[52] no specific proposal was made to change that rule.[53] After conducting its own extensive review, the commission recommended no change in that respect. (See Cal. Const.

[50] Each time, the voters have approved the proposed amendments. (Prop. 7, Gen. Elec. (Nov. 8, 1960); Prop. 11, Gen. Elec. (Nov. 3, 1970); Prop. 8, Primary Elec. (June 6, 1972); Prop. 15, Gen. Elec. (Nov. 2, 1976); Prop. 4, Gen. Elec. (Nov. 7, 1978); Prop. 113, Primary Elec. (June 5, 1990); Prop. 44, Primary Elec. (Mar. 5, 2002).)

[51] As observed *ante*, footnote 33, by 1964 Michigan—which since 1909 had employed a similarly strict rule, and yet at the same time allowed the state legislature to at least *propose* to the electorate that an initiative statute be amended—had amended its own constitutional provision to allow legislative repeal or amendment of an initiative statute at any time, by a supermajority vote.

[52] (See, e.g., Ops. Cal. Legis. Counsel, No. 7243 (Nov. 1964) Comparison of Draft of Proposed Revision of Article IV and Existing Article IV of the California Constitution, p. 7 [draft no. 5]; Special Counsel John A. Busterud, Joint Com. on Legis. Organization, letter *to* Cal. Const. Revision Com., Apr. 7, 1964, p. 2 [recommending consideration of a change permitting "amendment or repeal of initiatives by an extraordinary vote"]; Assem. Interim Com. on Const. Amends., Meeting on the Initiative and Effective Dates of Statutes (Dec. 13–14, 1965) pp. 95–96 [committee chair Edward E. Elliott commenting that idea of giving Legislature some power to amend initiative statutes "does appear to have some merit"]; Assem. Interim Com. on Const. Amends., Background Study on the Initiative (Nov. 1965) p. 13 [mentioning proposal to follow approach of Nat. Municipal League's 1963 model constitution and "[a]llow the Legislature the right to . . . amend an adopted initiative measure"]; see Nat. Municipal League, Model State Constitution (6th ed. 1963) p. 118, appen.)

[53] Nor did the Legislature itself endorse any such proposal for change. Assembly Constitutional Amendment No. 3, introduced January 4, 1965, by Assemblyman Winton, would have confined the electorate's initiative power to statutes only—and not constitutional amendments (*id.*, at pp. 1–2)—and would have permitted legislative amendment of an initiative-enacted

Revision Com., Proposed Revision (1966) p. 47 (Proposed Revision) [proposing revision of art. IV, § 24, subd. (c)].)[54] Nor did the Legislature's joint committee question that determination. (See Assem. Interim Com. on Const. Amends., Final Reps. (Jan. 2, 1967) 2 Appen. to Assem. J. (1967 Reg. Sess.).) The resulting Assembly Constitutional Amendment No. 13 proposed numerous revisions of article IV and various other articles, but no change concerning the strict limitation on legislative amendment of initiative statutes.[55] (See Stats. 1966, 1st Ex. Sess., ch. 139, pp. 960–961, 971–972.)

In the 1966 General Election, the voters adopted Assembly Constitutional Amendment No. 13 as Proposition 1-a, which relocated the initiative provisions to article IV, section 22 et seq. Revised article IV, section 24, subdivision (c) rephrased the former provision concerning repeal and amendment, without substantive change, to read as it does today: "The Legislature may . . . amend or repeal an initiative statute by another statute that becomes effective only when approved by the electors unless the initiative statute permits amendment or repeal without their approval." Thereafter, following two more failed attempts to change the provision to allow amendment by the Legislature, without voter approval, of statutes adopted by initiative,[56] the provision was renumbered in 1976, and remains today, as article II, section 10, subdivision (c).

---

statute by a two-thirds vote of each house. (*Id.*, at p. 3.) The proposal failed to secure the required two-thirds vote of each house, however, and hence no such measure was submitted to the voters.

[54] The commission characterized its proposed provision as "restat[ing] without change in meaning the existing provisions relating to amendment and repeal of initiative and referendum statutes. While the Legislature can amend or repeal a referendum statute, it cannot do so with an initiative statute without approval by the electors." (Proposed Revision, *supra*, p. 47.)

[55] With regard to the Constitution's initiative provisions, the California Constitution Revision Commission recommended two substantive changes to former article IV that the Legislature endorsed in Assembly Constitutional Amendment No. 13 (as enrolled July 18, 1966). The first change lowered the number of signatures necessary to place a statutory initiative on the ballot, from 8 percent of all votes cast for candidates for governor at the preceding gubernatorial election, to 5 percent of all such votes cast. (Proposed Revision, *supra*, pp. 43–44.) The second change removed the optional "indirect initiative" (that is, a petition to the Legislature, which then had the option to adopt the measure or to submit it, along with a competing measure, to the electorate). The purpose of the first change was to encourage sponsors of initiative measures to put forth a statutory initiative rather than a constitutional amendment. (*Id.*, at p. 44.) The optional "indirect initiative" was removed in light of the signature percentage change, and because "[it] merely adds an additional step to accomplish the same result that can be accomplished under the initiative generally" and "has been used only four times, and only once successfully." (*Id.*, at p. 52.)

[56] Assembly Constitutional Amendment No. 15, introduced January 24, 1973, would have required a two-thirds vote of the electorate for initiative constitutional amendments, and would have permitted legislative amendment of an initiative-enacted statute by a two-thirds vote of each house. (*Id.*, at p. 2.) Assembly Constitutional Amendment No. 66, introduced June 6, 1975, would have permitted the Legislature, after "a reasonable time," to amend or repeal any initiative statute by a majority vote, and would have permitted the Legislature to amend or

In the ensuing decades, numerous commissions and reports have recommended that California's initiative provision be altered to permit legislative amendment of initiative statutes without voter approval,[57] and on occasion bills have been submitted to so amend the Constitution.[58] But again, no such

repeal any initiative constitutional amendment by a two-thirds vote, "subject to the approval of the voters in the next ensuing general election." (*Id.*, at pp. 5–6 [proposed art. IV, § 22, subd. (h)].)

[57] See California Commission on Campaign Financing, Democracy by Initiative: Shaping California's Fourth Branch of Government (1st ed. 1992) page 118 (the Legislature should "be allowed to amend any initiative after its enactment, so long as the legislation amending an initiative 'furthers the purposes and intent of the law,' is in final form for at least 12 days and is approved by a 60% vote of both houses" [or a lesser percentage if the initiative so specifies]); Dubois and Feeney, Improving the California Initiative Process: Options for Change (1992) page 70 ("As the circumstances upon which [initiative] statutes are based change, the legislature should have the power to make changes. . . . [G]iving the legislature this kind of authority would reduce the number of ballot measures by eliminating the need to have trivial changes in old initiatives approved by the people"); Citizens Commission on Ballot Initiatives, Report and Recommendations on the Statewide Initiative Process (Jan. 1994) page 4 ("After three years of its enactment, the Legislature should be able to amend any statutory initiative (not constitutional amendments) by a two-thirds vote (or less if the initiative itself so specifies)," and any such amendment "must be consistent with the purposes and intent of the initiative"); California Constitution Revision Commission, Final Report and Recommendations to the Governor and the Legislature (1996) page 32 ("The Commission recommends that the constitution allow the legislature, with gubernatorial approval, to amend statutory initiatives after they have been in effect for six years" (italics & boldface omitted) in order to "allow the state to change laws and programs in response to changing circumstances" and "correct any unintended consequences caused by an initiative"); Dubois and Feeney, Lawmaking by Initiative, *supra*, at page 224 ("We recommend that all statutes be treated alike and that initiative statutes be subject to amendment and repeal by the legislature"); Democracy by Initiative, 2d ed., *supra*, at page 137 ("The legislature should be allowed to amend any statutory initiative after its enactment, so long as the legislation amending an initiative 'furthers the purposes and intent of the law,' is in final form for at least ten days, and is approved by a two-thirds vote of both houses"—or a lesser percentage if the initiative so specifies); see also Miller, *supra*, 41 Santa Clara L.Rev. 1037, 1067–1068 (recommending that the Legislature be afforded power to amend initiative statutes, but recognizing that such a rule would give initiative proponents "greater incentives to pursue constitutional initiatives rather than statutory initiatives for ordinary policies," and hence recommending reforms to make constitutional initiatives more difficult); but see Speaker's Commission on the California Initiative Process, Final Report (Jan. 2002) page 23 (listing, as a matter "considered but not adopted," a proposal to "[a]llow the Legislature and the Governor to amend a statutory initiative after a period of time without a confirming vote of the voters"); League of Women Voters of California, Action Policies and Positions (2008) page 2 (*continuing to recommend*—as originally adopted in 1984 and updated in 1999—that "[a]pproval by the voters should be required for any changes made by the legislature in a statute adopted by initiative, unless the statute permits amendment without the approval of voters").

[58] Senate Constitutional Amendment No. 44, introduced January 5, 1984, would have allowed the Legislature to amend or repeal an initiative statute (1) by a two-thirds vote, if the initiative statute had been adopted within the prior six years; or (2) by a majority vote, if the amendment or repeal was enacted more than six years following adoption of the initiative statute. (*Id.*, at p. 3.) Assembly Constitutional Amendment No. 49, introduced May 13, 1996, was an omnibus measure that, among other things, would have permitted the Legislature to

proposal has secured the necessary two-thirds vote of each house of the Legislature, and hence no such proposal has been submitted to the electorate.

3

 With this background in mind, we return to the Court of Appeal's threshold determination that section 11362.77 of the MMP, insofar as it places a specific limitation upon the amount of medical marijuana that a person protected by the CUA may possess and cultivate, constitutes an amendment of the CUA in violation of California Constitution, article II, section 10, subdivision (c). As observed earlier, this constitutional provision specifies that the Legislature may amend an initiative measure solely "by another statute that becomes effective only when approved by the electors"— unless "the initiative statute permits" such amendment explicitly.

In the present case, the CUA—unlike many other initiative measures in recent decades—did not grant the Legislature authority to amend.[59] Nor did

amend or repeal an initiative statute by a two-thirds vote, but only after a moratorium of six years following enactment of the initiative statute. (*Id.*, at p. 20.) Senate Constitutional Amendment No. 39, as amended June 6, 1996, page 20, tracked, in relevant part, Assembly Constitutional Amendment No. 49.

[59] See generally *Amwest Surety Ins. Co. v. Wilson* (1995) 11 Cal.4th 1243, 1251 [48 Cal.Rptr.2d 12, 906 P.2d 1112] ("It is common for an initiative measure to include a provision authorizing the Legislature to amend the initiative without voter approval only if the amendment furthers the purpose of the initiative . . . ."). As observed in Miller, *supra*, Santa Clara L.Rev. 1037, 1067, footnote 92: "In recent years, a majority of initiatives that have qualified for the ballot have authorized amendments, but usually only by a supermajority, and only to further the purposes of the initiative." As further explained in Democracy by Initiative, 2d ed., *supra*, at pages 114–115: "Since 1974, a growing percentage of statutory initiatives have . . . voluntarily permitted the legislature to amend their provisions, although none has allowed the legislature to repeal the measure. Of the 107 statutory measures between 1976 and 2006 that qualified for the ballot, 78 (73%) had language authorizing amendments. Between 2000 and 2006, 15 of the 18 statutory initiatives on the ballot (83%) allowed legislative amendments. [¶] Proponents are increasingly allowing the legislature to amend their initiatives for a number of reasons. First, they are becoming more sophisticated in drafting their measures and are hiring experienced lawyers for this purpose. These lawyers know that no complex law can be drafted perfectly, and few laws can be left in place for years without needing fine-tuning or additions. [¶] Second, initiatives are becoming more complex as they seek to adopt detailed solutions to perceived problems. Initiatives are not general policy statements asking the legislature to solve a problem. They contain specific, legal language that must be kept flexible for continued viability. [¶] Finally, the legislature, despite a few exceptions, has generally been respectful of initiatives and has not sought to amend them without at least the tacit approval of the proponents. The legislature has amended the Political Reform Act over 200 times. In virtually every instance, the Fair Political Practices Commission, the watchdog agency created by the act and charged with its administration, has not objected." (Fn. omitted.) Similarly, it has been suggested that although California's strict rule may have been motivated by fear that the Legislature "would hastily tear down what the people have enacted through the initiative process, the general experience in the United States is that legislatures are reluctant to

the Legislature merely propose the MMP and submit it to the electorate for approval. Instead, the Legislature adopted that scheme on its own, without seeking ratification by the electorate.

 In view of the case law recited in part IV.A and B—which is, in turn, consistent with the history of article II, section 10, subdivision (c) recited in part IV.D.2—we conclude that section 11362.77, by imposing quantity limitations upon "qualified patients" and "primary caregivers," amends the CUA. Under the CUA as adopted by Proposition 215, these individuals are not subject to any specific limits and do not require a physician's recommendation in order to exceed any such limits; instead they may possess an amount of medical marijuana reasonably necessary for their, or their charges', personal medical needs. By extending the reach of section 11362.77's quantity limitations beyond those persons who voluntarily register under the MMP and obtain an identification card that provides protection against arrest—and by additionally restricting the rights of all "qualified patients" and "primary caregivers" who fall under the CUA—the challenged language of section 11362.77 effectuates a change in the CUA that takes away from rights granted by the initiative statute. (*Cooper, supra,* 27 Cal.4th 38, 45 [finding no amendment]; *Knight, supra,* 128 Cal.App.4th 14, 25 [same]; *Proposition 103 Enforcement Project, supra,* 64 Cal.App.4th 1473, 1484–1486 [finding an impermissible amendment].) In this sense, section 11362.77's quantity limitations conflict with—and thereby substantially restrict—the CUA's guarantee that a qualified patient may possess and cultivate *any amount of marijuana reasonably necessary for his or her current medical condition.* In that respect, section 11362.77 improperly amends the CUA in violation of the California Constitution.[60]

As the Governor suggested when he vetoed the 2004 legislation that had been designed to amend section 11362.77 of the MMP in order to avoid the

change laws that have been adopted through the initiative process," and hence there remains "no valid reason . . . for significantly limiting the legislature's ability to amend and repeal initiative statutes." (Dubois & Feeney, Lawmaking by Initiative, *supra,* at p. 224.)

[60] The case before us is unusual, in that both parties agree with the conclusion that the statutory enactment constitutes an unconstitutional amendment. We observe that, although not mentioned in the briefs, the opposite conclusion was reached by the Legislative Counsel of California, in an opinion letter dated January 8, 2004. (See Cal. Legis. Counsel, letter to Sen. Vasconcellos, Jan. 8, 2004, titled "Medical Marijuana: Proposition 215.") The Legislative Counsel reasoned that the challenged portions of the MMP did not amend the CUA, because, in light of section 11362.77, subdivision (b), the *"ultimate limit* that Section 11352.77 places on the amount of marijuana that a qualified patient or primary caregiver may possess or cultivate is *substantially the same* as the limit provided under [the CUA], as construed by the court in [*Trippet, supra,* 56 Cal.App.4th 1532] at page 1549, which is the amount reasonably related to the patient's current medical needs." (Letter, at pp. 9–10, italics added.) In other words, the Legislative Counsel reasoned, because section 11362.77, subdivision (b), provides that a qualified patient may *possess* an amount of marijuana "consistent with the patient's needs" so long as the patient "has a doctor's recommendation that [the eight-ounce limitation

constitutional problem identified above, it may well be prudent and advisable *for the Legislature to be able* to change the CUA so as to set forth specific guidance as to quantity limitations, for the mutual benefit of law enforcement officials as well as authorized users of medical marijuana. (See Governor's veto message to Sen. on Sen. Bill No. 1494 (2003–2004 Reg. Sess.) Sen.

---

set forth in subd. (a)] does not meet the qualified patient's medical needs," the "ultimate" limits set by the MMP are *"essentially the same"* as those set by the CUA. (Letter, at p. 10, italics added.)

The problem with the Legislative Counsel's theory—and perhaps the reason that the Attorney General does not advance it in this court—is that subdivision (b) of section 11362.77 of the MMP does not truly "substantially" or "essentially" replicate the "reasonable amount" test of the CUA, as construed in *Trippet, supra,* 56 Cal.App.4th at page 1549. Instead, as alluded to *ante,* footnote 21, in two ways, the rights conferred by subdivision (b) of section 11362.77 fall significantly short of matching the rights established by the CUA.

First, on its face, subdivision (b) speaks only of the right to "possess" dried marijuana consistent with a patient's needs—it does not expressly track subdivision (a) by covering both possession of dried marijuana *and* maintenance (cultivation) of plants. Presumably, this limitation was intentional. The Legislature may have concluded that physicians would be able to estimate the amount of dried marijuana that a patient would need to possess for personal medical use, but would not be qualified to estimate the number of plants that a patient additionally would need to cultivate in order to maintain a regular supply for such use. In any event, in this respect, subdivision (b) of section 11362.77 addresses only part of what is covered by the CUA. Accordingly, even if a physician recommends under subdivision *(a)* of section 11362.77 that eight ounces is insufficient for a patient's needs, subdivision *(b)* of that section provides no similar "override" for the *cultivation* limitation ("six mature and 12 immature marijuana plants"), and hence, in this respect at least, the MMP clearly "takes away" from a right created by the CUA.

Second, insofar as the right to possess marijuana is concerned, subdivision (b) of the MMP enactment does contemplate a standard similar to the "reasonable amount" standard afforded under the CUA as construed by *Trippet, supra,* 56 Cal.App.4th at page 1549. Unlike the CUA, however, this subdivision imposes a burden on that right, by requiring a physician's recommendation that an eight-ounce allotment does not meet the person's medical needs. As suggested *ante,* footnote 10, this burden is substantial, because physicians are counseled by the California Medical Association that in light of federal case law, physicians should avoid offering advice concerning matters such as "how much medicinal cannabis the patient should take." (CMA On-Call, *supra,* at p. 15.) Moreover, the CMA cautions, although physicians may "opine that the allowable amount of cannabis does not appear to meet a particular patient's medical needs," they may do so only if the physician "has a reasonable basis for such an opinion." (*Id.,* at p. 16, italics omitted; see also *id.,* at p. 20.) We also observe that although the defendants in *Wright, supra,* 40 Cal.4th 81, and *People v. Windus, supra,* 165 Cal.App.4th 634 (both mentioned *ante,* fn. 8) each secured a recommendation consistent with section 11362.77, subdivision (b), from a physician who testified accordingly at trial, in both cases the physician was the same—William Eidelman, M.D., whose professional license was suspended from May 2002 through February 2004. (*Windus, supra,* at p. 638; *Wright, supra,* at p. 86.)

In light of the restricted scope of coverage provided by 11362.77, subdivision (b) (that is, its creation of an exception to the quantity limitations set forth in subd. (a) for possession but not for cultivation), and in light of the added obligation this subdivision places upon a qualified patient's ability to argue that he or she possessed an amount of marijuana reasonably related to his or her medical needs (that is, the requirement of obtaining a physician's recommendation that the amount set forth in subd. (a) is insufficient), we conclude that the MMP burdens, and "takes away" from, rights established by the CUA.

Daily J. (July 20, 2004) pp. 4676–4677.) In a similar vein, as observed *ante*, footnote 57, commissions and commentators have urged that the California Legislature *should* have the same authority possessed by the legislatures of all other states to directly amend an initiative statute in order to correct errors, clarify application, or simply make alterations that have been proved by experience to be warranted.[61] And yet, as demonstrated by the history and case law set forth above, the flexibility to make desirable or even *necessary* adjustments to initiative statutes long has been, and remains, foreclosed by article II, section 10, subdivision (c), and its predecessor incarnations.

As observed earlier, beginning almost immediately after adoption of the initiative provision in 1911, and continuing through a number of efforts in recent decades, various proposals have been advanced, and legislative attempts have been made, to change California's constitutional system in order to bring the state in line with our sister jurisdictions. These efforts have aimed to eliminate the strict limitation on the power of the Legislature (or at least to moderate that power) by, for example, allowing amendments that "further the purpose" of the original initiative measure, or allowing amendments after a moratorium of years, or allowing amendments by a supermajority vote of both houses. And yet all such efforts have failed.

Over the course of the decades during which California has had the initiative process, the sole substantive alteration to the governing constitutional provision occurred in 1946, when it was changed to allow the Legislature at least to *propose* an amendment to an initiative statute, subject to ratification by the statewide electorate at the ballot. That minor adjustment to the strict rule of nonamendability highlights and reinforces the closely circumscribed limits of the Legislature's authority in this regard: the Legislature is powerless to act *on its own* to amend an initiative statute. Any change in this authority must come in the form of a constitutional revision or

---

[61] Indeed, commentators have suggested that the combination of (1) the restriction imposed by article II, section 10, subdivision (c), together with (2) various initiative measures adopted by California voters during recent decades, including those mandating spending for programs without providing funding for those programs, has contributed substantially to the unique budgetary and governance problems faced by this state. (See, e.g., Joseph, *The System Is the Problem with California's Budget*, Orange County Register (June 5, 2009) [commenting upon both matters]; *The Ungovernable State*, The Economist (May 14, 2009) pp. 33–36 [same]; see also Baldassare and Katz, The Coming Age of Direct Democracy (2008) pp. 15–16 [citing estimates that approximately 77 percent, and possibly as high as 90 percent, of the state's general fund is beyond legislative control due to initiative statutes]; see generally Schrag, California: America's High-Stakes Experiment (2006) pp. 95, 143–145; but see Matsusaka, *Direct Democracy and Fiscal Gridlock: Have Voter Initiatives Paralyzed the California Budget?* (2005) 5 State Pol. & Policy Q. 248, 248, 257–258 [asserting that empirical evidence does not support the widely held view that initiatives have "locked in" 70 to 90 percent of the state budget, and further opining that measures enacted by initiatives appear not to pose a "significant obstacle" to balancing the state budget].)

amendment to article II, section 10, subdivision (c). Therefore, we are compelled to conclude that section 11362.77 impermissibly amends the CUA and, as we explain below, is unconstitutional as applied in this case.

V.

As observed earlier, after the Court of Appeal concluded that section 11362.77 (together with its quantity limitations) is unconstitutional insofar as this statute burdens a defense otherwise available under the CUA, that court further held that section 11362.77 "must be severed from the MMP" and hence voided in its entirety. The Attorney General asserts that the Court of Appeal erred in imposing this remedy. Instead, the Attorney General argues, although section 11362.77 can have no effect insofar as it would burden a defense afforded by the CUA, in a defendant's attempt to establish that a quantity of marijuana possessed was reasonable for a person's current medical needs, the statute need not and should not be severed from the MMP and voided in its entirety. The Attorney General advocates that section 11362.77 should remain an enforceable part of the MMP, applicable to the extent possible—including to those persons who voluntarily participate in the program by registering and obtaining identification cards that provide protection against arrest. Defendant essentially agrees with the Attorney General in this respect.

In this regard, both parties rely upon the decision of the Court of Appeal in *San Diego NORML, supra*, 165 Cal.App.4th 798. In that case, counties challenged the MMP's identification card program—specifically, the duty imposed upon counties by section 11362.72 of the MMP to "implement a program permitting a limited group of persons . . . who qualify for exemption from California's statutes criminalizing certain conduct with respect to marijuana[,] . . . to apply for and obtain an identification card verifying their exemption." (165 Cal.App.4th at p. 808.) These counties claimed that the MMP's identification card program constitutes an impermissible amendment of the CUA. The appellate court acknowledged that because the CUA contained no provision allowing amendment by the Legislature, the MMP's "identification laws . . . are invalid if they *amend* the CUA within the meaning of article II, section 10, subdivision (c) . . . ." (*San Diego NORML, supra*, 165 Cal.App.4th at p. 829.)

Citing and applying *Cooper, supra*, 27 Cal.4th 38, 47, and *Mobilepark West Homeowners Assn., supra*, 35 Cal.App.4th 32, 43, the appellate court in *San Diego NORML* concluded that "the identification [card] laws [of the MMP] do not improperly amend the provisions of the CUA." (*San Diego NORML, supra*, 165 Cal.App.4th 798, 830.) The court stated: "The MMP's identification card system, by specifying [that] participation in that system is voluntary

and a person may 'claim the protections of [the CUA]' without possessing a card (§ 11362.71, subd. (f)), demonstrates the MMP's identification card system is a discrete set of laws designed to confer distinct protections under California law that the CUA does *not* provide[,] without limiting the protections the CUA *does* provide. For example, unlike the CUA, which did not immunize medical marijuana users from arrest but instead provided a limited 'immunity' defense to prosecution under state law for cultivation or possession of marijuana [citation], the MMP's identification card system is designed to protect against unnecessary arrest. (See § 11362.78 [law enforcement officer must accept the identification card absent reasonable cause to believe card was obtained or is being used fraudulently].)" (*San Diego NORML, supra*, 165 Cal.App.4th 798, 830.)

The court in *San Diego NORML* concluded: "Here, although the legislation that enacted the MMP added statutes regarding California's treatment of those who use medical marijuana or who aid such users, it did not add statutes or standards *to the CUA*. Instead, the MMP's identification card is a part of a separate legislative scheme providing separate protections for persons engaged in the medical marijuana programs, and the MMP carefully declared that the protections provided by the CUA were preserved without the necessity of complying with the identification. card provisions. (§ 11362.71, subd. (f).) [In this sense] [t]he MMP, in effect, amended provisions of the Health and Safety Code regarding regulation of drugs adopted by the Legislature, not provisions of the CUA. Because the MMP's identification card program has no impact on the protections provided by the CUA, we reject Counties' claim that those provisions are invalidated by article II, section 10, subdivision (c) of the California Constitution." (*San Diego NORML, supra*, 165 Cal.App.4th 798, 831; accord, *People v. Hochanadel* (2009) 176 Cal.App.4th 997, 1011–1014 [98 Cal.Rptr.3d 347] [holding that § 11362.775 of the MMP, concerning collectives or cooperatives, does not constitute an unconstitutional amendment of the CUA].)

We agree with the parties that the Court of Appeal below erred in concluding that section 11362.77 must be severed from the MMP and voided in its entirety.

■ We begin with the fundamental proposition that in resolving a legal claim, a court should speak as narrowly as possible and resort to invalidation of a statute only if doing so is necessary. (*Dittus v. Cranston* (1959) 53 Cal.2d 284, 286 [1 Cal.Rptr. 327, 347 P.2d 671] ["Courts should exercise judicial restraint in passing upon the acts of coordinate branches of government; the presumption is in favor of constitutionality, and the invalidity of the legislation must be clear before it can be declared unconstitutional."]; see also, e.g.,

*In re M.S.* (1995) 10 Cal.4th 698, 710 [42 Cal.Rptr.2d 355, 896 P.2d 1365]; *Conservatorship of Roulet* (1979) 23 Cal.3d 219, 231, fn. 9 [152 Cal.Rptr. 425, 590 P.2d 1].)

■ The Court of Appeal provided no reason for its conclusion that section 11362.77 must be severed from the MMP and hence voided in its entirety— and we discern no principled basis for doing so. A determination that section 11362.77 is unconstitutional insofar as it might be applied in a manner that burdens a defense authorized by the CUA does not, in and of itself, require invalidation of the remaining aspects of this statute; there is no operational or functional reason for such a conclusion. Section 11362.77 continues to have legal significance, and can operate as part of the MMP, even if it cannot constitutionally restrict a CUA defense.

■ As both parties argue, the appropriate remedy in the circumstances presented is to disapprove, or disallow, *only the unconstitutional application* of section 11362.77, thereby preserving any residuary constitutional application with regard to the other provisions of the MMP. (Cf. *Walnut Creek Manor v. Fair Employment & Housing Com.* (1991) 54 Cal.3d 245, 266–267 [284 Cal.Rptr. 718, 814 P.2d 704].) It seems clear that the Legislature would have preferred such a result had it foreseen the invalidity of section 11362.77 insofar as the statute burdens a defense otherwise available under the CUA. Section 11362.82 provides that "any section, subdivision, sentence, clause, phrase, or portion" of the MMP adjudged invalid or unconstitutional "shall not affect the validity of the remaining portion[s]" of the act.[62] Although the language of section 11362.82 differs from the severability clause at issue in *Walnut Creek, supra,* 54 Cal.3d 245, 267, which expressly called for the severance of any invalid *application* of the statute there at issue, the circumstance nonetheless remains that " '[a]lthough not conclusive, a severability clause normally calls for sustaining the valid part of the enactment . . . .' " (*Calfarm Ins. Co. v. Deukmejian* (1989) 48 Cal.3d 805, 821 [258 Cal.Rptr. 161, 771 P.2d 1247].) In this regard, and in view of the history set forth in our opinion in the present case, we are confident that the Legislature would have extended the severability provisions of section 11362.82 to include invalid applications of the MMP had it foreseen the circumstances here at issue.

Accordingly, although we disallow the invalid application of section 11362.77—that is, insofar as the terms of the statute purport to burden a defense otherwise available to qualified patients or primary caregivers under

---

[62] Section 11362.82 provides: "If any section, subdivision, sentence, clause, phrase, or portion of this article is for any reason held invalid or unconstitutional by any court of competent jurisdiction, that portion shall be deemed a separate, distinct, and independent provision, and that holding shall not affect the validity of the remaining portion thereof."

the CUA—we conclude that the Court of Appeal erred in holding that section 11362.77 must be severed from the MMP and hence voided in its entirety.

## VI.

 Whether or not a person entitled to register under the MMP elects to do so, that individual, so long as he or she meets the definition of a patient or primary caregiver under the CUA, retains all the rights afforded by the CUA. Thus, such a person may assert, as a defense in court, that he or she possessed or cultivated an amount of marijuana reasonably related to meet his or her current medical needs (see *Trippet, supra*, 56 Cal.App.4th 1532, 1549), without reference to the specific quantitative limitations specified by the MMP.

 We conclude as follows: To the extent section 11362.77 (together with its quantitative limitations) impermissibly amends the CUA by burdening a defense that would be available pursuant to that initiative statute, section 11362.77 is invalid under California Constitution, article II, section 10, subdivision (c). Nevertheless, it would be inappropriate to sever section 11362.77 from the MMP and hence void that provision in its entirety. To the extent the judgment of the Court of Appeal purports to sever section 11362.77 from the MMP and to void this statute in its entirety, the judgment is reversed. In all other respects, the judgment is affirmed.

Kennard, J., Baxter, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.